STATE of Missouri, Respondent,

v.

Armond BOLDEN, Appellant.

No. 55541.

Supreme Court of Missouri,
Division No. 1.

April 9, 1973.

Motion for Rehearing or to Transfer to Court En Banc Denied May 14, 1973.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for respondent.

Wesley D. Wedemeyer and Zimbalist, Sachs, Schramm & Branom, Clayton, for appellant.

HIGGINS, Commissioner.

Armond Bolden, charged with assault with intent to kill with malice aforethought, was convicted by a jury of assault with intent to kill without malice. The jury was unable to agree on defendant's punishment; the court assessed his punishment at four years' imprisonment, and rendered sentence and judgment accordingly. §§ 559.180, 559.190, RSMo 1969, V.A.M.S.; Rule 27.03, V.A.M.R. (Appeal taken prior to January 1, 1972.)

Under his Point VI, appellant asserts "the credible evidence was insufficient to sustain a conviction since there was a reasonable doubt of * * * guilt as a matter of law." His argument is that testimony of the prosecuting witness is incredible and that the State did not meet its burden on the issue of self-defense.

Accordingly, the evidence will be stated in some detail because such statement demonstrates sufficiency of evidence to sustain the conviction, and that conflicts in the respects noted were properly resolved by the jury.

As suggested by appellant's statement, it is undisputed that on August 24, 1969, at about 4:30 p. m., Armond Bolden and his wife Ruby were driving their separate automobiles on the streets of St. Louis, Missouri, when Armond signaled his wife to stop. An altercation ensued during which Ruby was shot from two to four times by Armond, and Armond was shot twice, either by himself or by Ruby. One pistol was found at the scene; another was given to police at the hospital. Both parties were hospitalized; both subsequently recovered.

It is also undisputed that Armond, age 32, and Ruby, age 28, had been married about seven years at the time of trial in October 1969, but had been separated since November 10, 1968. During this separation, they had visited each other several times and discussed reconciliation. Reconciliation efforts failed, however, and Mrs. Bolden sued her husband for divorce in July or August, 1969, with service accomplished on Mr. Bolden in August sometime prior to the shootings. There had been three prior separations.

According to Mrs. Bolden, she was taking her two children and two nieces to the zoo. She first saw her husband at Pope and Carter and then noticed he was following her. After some four blocks, at Kossuth and Newstead, "He pulled over in front of me and forced me to the curb * * * so I couldn't turn around. * * * Then he approached my car with a gun. * * * He came to my side and shot into the driver's side at me." He shot her twice "and then my foot released the -brake and my car rolled to the service station lot that was across the street and rolled into a truck, and then he came up and then he shot me two other times." The first shot struck her in the mouth, "because I remember blood gushing out of my mouth and I remember I grabbed my mouth * * * and teeth and bone and whatnot was flying out." The second shot hit her in the left nostril and the third and fourth shots hit her in the arm and side.

"I remember hearing two other shots being fired, but I didn't feel the impact of the bullets."

Prior to August 24, 1968, on July 15, 1968, "my husband broke both of my jaws. * * * He said that if I had him arrested that he would get me for it. * * * He would kill me. * * * I called the police at the hospital and they came over and I issued an arrest order." Mrs. Bolden denied carrying a gun.

Marlene Canada, also known as Marlene Tatum, twelve-year-old niece of Mrs. Bolden, was riding in the rear seat of her aunt's car with Armond, Jr., and Shawn Bolden, small children of Armond and Ruby Bolden. She saw her uncle approach her aunt's side of the car and heard three shots, after which she turned her head and started screaming. The shots entered through the window of the driver's seat and hit her aunt. She heard two additional shots and saw them fired by Mr. Bolden into his chest. She did not see Ruby with any gun that day, denied that her mother owned a gun, and stated she had never seen her mother give a gun to her sister, Ruby Bolden.

Barbara Tatum, sixteen-year-old niece of Ruby Bolden, was riding in the front seat of her aunt's car when her uncle Armond shot Ruby. She heard about two shots fired at her aunt which struck her in the face. She then jumped from the car after which she heard other shots. Her aunt did not have a gun in her hand.

Patrolman Marvin Boone of the St. Louis Police Department arrived at the scene of the shootings at about 4:40 p. m. Ruby Bolden had been removed to a hospital; defendant was present leaning against a truck with two bullet wounds in his upper left chest. Patrolman Boone took Armond to City Hospital No. 2 where he also saw Ruby Bolden, unable to speak, bleeding, and prepared for surgery. A .32 caliber pistol was given to him at the hospital by a person who had taken Ruby to the

hospital; he had not seen such weapon at the scene.

Patrolman William Lore, also of the St. Louis Police Department, was the first officer to arrive at the scene of the shootings. He saw Armond Bolden leaning against a truck, and he was removed to the hospital by Patrolman Boone. He found a .38 caliber Smith and Wesson revolver and three or four spent shells. Ruby Bolden had already been removed from the scene.

Defendant's version of the incident in July was that he went to Ruby's apartment and "she was complaining of her jaw, so I carried her to the hospital in my car and admitted her on my insurance * * *." He was not arrested as a result of that incident. He acknowledged receipt of the divorce papers "and the grounds were a lot of things that were untrue, and so I wanted to talk to her about that." On the day in question, "I had been to get the car washed and I went back home and cleaned up and I was on route to the hospital to see my cousin * * * and I dropped Charles Hamm off over to Mr. Moore's. * * * And then I proceeded to go to the hospital, and I saw Ruby, which is my wife, so I beckoned for her to pull over, which she did, and then I parked my car" in front of her. "* * * as I approached the car, well, she was cursing, and then when I approached the car she shot me and then I went to try to talk to her again and then * * * it appeared as if she was fixing to shoot me again, so I ran back to my car and got my gun and I guess out of instinct and also being shot, I shot her." He was hit over the heart, and after he shot her, "she was lying over in the car * * * and it eased across the street, and then she got out with the gun in her hand and I snatched it from her hand and then I dropped it because I was getting weak. And by this time * * * some fellow assisted me to the truck bumper * * *." Armond claimed the .38 caliber revolver as his and admitted he shot Ruby with it. He said the .32 caliber revolver belonged to Ruby's sister, Gladys

Tatum, and that he had seen it many times in Ruby's possession. He dropped his own weapon at the scene. He believed his wife had been associating with other men during the separation. He had been convicted of stealing a hat some twelve years previous to this incident for which he refused to pay a fine and served time instead.

Charles Hamm happened by the scene but both Armond and Ruby were gone. He saw bullet holes in the driver's window of Ruby's car. He did not see the .38 caliber weapon at the scene but had seen it in the apartment he shared with Armond; he saw the other gun at the scene.

In addition to questioning the sufficiency of evidence, appellant presents five charges of trial error.

He complains, first, that the court erred in admitting, over his objection, testimony of the victim that her husband had broken her jaw more than one month prior to the offense for which he was now on trial. He asserts such was evidence of another crime for which he was not on trial and that it deprived him of a fair trial.

Linked to this is appellant's Point III by which he charges error in admission of the testimony that the victim reported the jaw-breaking incident to the police and that a warrant or arrest order was issued. He asserts this to be improper since only a conviction of crime is admissible to affect his credibility and this was inadmissible for any purpose, and he was thus denied a fair trial.

These matters arose during the State's examination of Mrs. Bolden:

"Q And had you been involved in an incident with your husband where he had done some bodily injury to you? A Yes. Q About how long before this actual shooting incident did this occur? Mr. Fitzsimmons: Your Honor, I'll object to this as being immaterial to this lawsuit, and not related to this charge. * * * Mr. Altobelli: Your Honor, what I'm trying to establish is simply this: That

there was an incident that occurred prior to this shooting that set up the motivational pattern for the shooting incident, that in effect a threat had been made against Mr[s]. Bolden about the incident that occurred earlier wherein he had indicated that if she did certain things that he would shoot her. * * * And I think this is an exception to the rule where information or evidence of prior offense cannot be introduced because this shows a pattern, this shows a reason for the particular offense that we're trying today. Mr. Fitzsimmons: Your Honor, I'll object on the basis that this is not a charge of murder or a crime which requires premeditation. Any statement of any previous incident would be of another crime and would also be unrelated to this incident. He's charged with assaulting her on this day, not with another crime on [an]other day. * * * Mr. Altobelli: Well, you see, the thing is, Your Honor, we have charged this defendant with assault with intent to kill with malice. What we are suggesting is that there was malice aforethought, that there was intention, that there was a design, that there was a purpose for this shooting incident based on an incident that occurred previously. And I think that they're all related. Mr. Fitzsimmons: I'll just rest on my objection as evidence of another crime. The Court: Overruled. * * *

"Q (By Mr. Altobelli) Mrs. Bolden, this incident that occurred prior to the date of August 24, when did that occur? A July 15. Q July 15. And what occurred at that time? A My husband broke both of my jaws. Q Now, was there any indication by your husband or any threat made to you as a result of that incident? A Yes. He said that if I had him arrested that he would get me for it. Q Specifically, what did he mean by get you for it? A He would kill me. Q And did you then proceed to take some affirmative action on this particular assault? A Yes. I called the police at the hospital and they came over and I issued an arrest order. Q And it was then on

that basis that you feel that the defendant, your husband, assaulted you on that day of August 24? A Yes."

■ It is true, generally, that the State cannot prove against a defendant a crime not charged; however, there are five exceptions to such rule, two of which make evidence of another crime competent to prove the specific crime charged when it tends to establish motive and intent. State v. Spinks, 344 Mo. 105, 125 S.W.2d 60, 63 (1939); State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, 307 (Banc 1954).

■ Armond Bolden was charged with assault with intent to kill with malice aforethought. The presence of malice aforethought is the element that distinguishes assault with intent to kill with malice and assault with intent to kill without malice; and to prove assault with intent to kill, it is necessary to show specifically the intent to kill or do great bodily harm. §§ 559.190, 559.180, supra; State v. Cooper, 358 Mo. 269, 214 S.W.2d 19, 21[5] (1948). The law presumes malice as a concomitant of a shooting with a dangerous and deadly weapon, State v. Ayers, 305 S.W.2d 484, 486[2] (Mo.1957); but the element of intent remains a question for the jury and the law raises no presumption about it, State v. Venable, 177 S.W. 308, 309[5] (Mo.1915). Accordingly, the evidence of prior assault and accompanying threats, if reported, tended to show the intent and motive behind the present crime, and evidence of such was thus properly admitted. Neither State v. Spinks, supra, State v. Reese, supra, nor State v. Spray, 174 Mo. 569, 74 S.W. 846 (1903), is in point because they deal with the error in admitting evidence of crimes totally unrelated to the charge on trial.

■ The charge of error of Point III is not properly for review because the quoted record shows there was no objection to any of the testimony concerning arrest, Rule 83.13(a); Rule 27.20(c). Accordingly, appellant's citations on the effect of admit-

ting testimony concerning arrest need not be considered.

Appellant's complaint by Point II is that the court erred in overruling his objection to the State's voir dire examination of prospective jurors. He asserts "the State obtained from the jurors their assurance that they would convict if the State proved appellant's guilt beyond a reasonable doubt. This was an improper attempt to commit jurors" before they had heard evidence, argument or instructions, and denied him a fair trial.

Appellant's objection occurred in this context: "Now, knowing what the punishment range is, do you feel that you would be in a position to render a verdict and judgment as far as the time that the defendant would be given if the State did prove, in fact, that he was guilty? Would there be any reason why you could not render a verdict within the range of punishment that's established by law? MR. FITZSIMMONS: I'm going to object to that question as being an attempt to predispose the jury to a specific set of facts that they will prove and commit them to that punishment. THE COURT: Overruled. MR. ALTOBELLI: Now let me ask you members of the jury panel, is there any reason whatever—I mean any reason, personal, religious, or moral, that would prevent you from sitting in on this particular type of a crime and listening to the evidence and rendering a verdict? Is there any reason, based on personal, religious, or moral grounds? I take it by your silence then you feel that you can render a fair and impartial verdict."

■■■ It is true that the State may not question jurors in an attempt to obtain their commitment to convict before they have heard evidence, argument or instructions. State v. Pinkston, 336 Mo. 614, 79 S.W.2d 1046 (1935); State v. Katz Drug Co., 352 S.W.2d 678 (Mo. banc 1961); State v. Kiner, 441 S.W.2d 720 (Mo.1969). However, there is no fixed and inflexible rule which may, in all cases, determine the extent to which counsel may be permitted to go in voir dire examination. State v. Crockett, 419 S.W.2d 22 (Mo.1967).

■■■ The context of this questioning does not call for an improper commitment to a verdict of guilty. There was no hypothesis of facts upon which the jury was asked if they would convict; the only assumption was that guilt would be proved after which the jurors were asked if there was any reason why they could not render a proper verdict. The succeeding question was general in the nature of determining whether there were any scruples which would prevent rendering a fair and impartial verdict. Similar questioning was not an abuse of the trial court's discretion in control of voir dire in State v. McCaine, 460 S.W.2d 618 (Mo.1970); State v. Gray, 423 S.W.2d 776 (Mo.1968); State v. Heard, 460 S.W.2d 570 (Mo.1970); State v. Phelps, 478 S.W.2d 304 (Mo.1972).

Appellant's Point IV charges the court erred in overruling his objection to testimony from Marlene Canada "who was not properly endorsed since this surprised * * * and deprived him of the right to properly prepare for cross-examination." He asserts this to call for reversal because it violated Rule 24.17 which provides that all material witnesses for the prosecution shall be endorsed on the indictment or information.

Appellant's position is fraught with several difficulties. First, the witness was endorsed on the information as Marlene Tatum and she stated she was also known as Marlene Canada, the name by which she identified herself when called. Second, the witness was the daughter of the victim's sister, Gladys Tatum, and thus the niece of the victim and, by marriage, of the defendant. Third, defendant stated he had kept in close contact with his family despite separations and, fourth, the record shows a comprehensive cross-examination of the witness on behalf of defendant including

injection through the witness of evidence that she had seen her mother with a "nickel-plated revolver."

 Under these circumstances, it could be said that the witness had been endorsed, albeit imperfectly. In any event, an exercise of discretion by which an unendorsed witness is permitted to testify does not call for reversal absent a showing of prejudice. State v. Goodpaster, 438 S.W.2d 256 (Mo.1969); State v. Moore, 428 S.W.2d 563 (Mo.1968). This record does not so show because it is most reasonable to believe that defendant expected both his nieces to testify and was not actually surprised when the witness identified herself as Marlene Canada.

Finally, appellant charges error in instructing the jury that the court would assess the punishment if the jury agreed on guilt but could not agree on punishment. He argues that the State qualified the jurors on their ability to assess punishment and that the court, by giving the instruction, invited them to evade their responsibility and thus deprived defendant of his right to determination of punishment by the jury.

In presenting this contention appellant relies on State v. Stuver, 360 S.W.2d 89 (Mo.1962), but concedes that in State v. Brown, 443 S.W.2d 805 (Mo. banc 1969), the instruction in question was given after considerable deliberation, and that the court stated a broad general rule "which seemed to overrule the Stuver case" and authorize giving the instruction prior to any deliberation. In State v. Thompson, 465 S.W.2d 590 (Mo.1971), the instruction in question was given prior to any deliberation, and such procedure was determined to be proper on the rule of State v. Brown, supra. The instruction has also received approval in other cases, e. g., State v. Mills, 465 S.W.2d 554 (Mo.1971); and, for the reasons of those cases, it will not be re-evaluated now. See also § 546.440, RSMo 1969; Rule 27.03.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the Court.

All of the Judges concur.