STATE of Missouri, Plaintiff-Respondent,

v.

Chester Lee HOLLIMAN, Defendant-Appellant.

No. 36150.

Missouri Court of Appeals, St. Louis District, Division Three.

Nov. 4, 1975.

James C. Jones, Asst. Public Defender, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

McMILLIAN, Judge.

Defendant was convicted by a jury of arson and murder in the first degree. The Circuit Court of the City of St. Louis entered judgment on the jury's verdict and sentenced defendant to serve consecutive sentences in the custody of the Missouri Department of Corrections of forty (40) years for the arson conviction followed by life imprisonment for the murder in the first degree conviction.

Four issues are raised: (1) the admissibility of evidence of offenses other than the offense charged; (2) the propriety of permitting one witness to testify as to an identification made by another witness; (3) the permissibility of allowing a jury view of a photograph of the deceased; and (4) the effect of the refusal of the court to exclude a prospective juror for cause, thereby making defendant use one of his peremptory challenges to excuse said juror.

On April 5, 1973, at or about 7:00 P.M., defendant was observed by Mrs. Bernice Atkins, a niece of his wife, Allimetria Holliman, kicking and beating on Mrs. Holliman's apartment door. Both Mrs. Holliman and Bernice lived at 5777 Westminster in a six-family, three-story apartment complex. Bernice lived on the second floor and Mrs. Holliman on the first floor. When Bernice heard the noise, she stepped outside her apartment to investigate. Standing on the second floor landing, she called to defendant, who fired a shot at her. The pellet struck the wall and fell on the steps leading to the second floor landing.

Just before defendant fired at Bernice, he had successfully opened his wife's apartment door. He entered and beat her over the head with the butt end of the rifle. Bernice came quickly to help her aunt. She was able to subdue defendant long enough for Mrs. Holliman to get free and run upstairs to telephone the police. When Bernice was no longer able to contain him, defendant shoved her down and left.

Officer Martin arrived at or about 7:30 P.M. After being told what had happened, he put out an arrest order for defendant. Prior to taking Mrs. Holliman to the hospital for treatment, Officer Martin noticed the broken lock and the debris, and found a spent shell casing near Mrs. Holliman's apartment door. Officer Powell, a member of the Evidence Technician Unit, who arrived at about 7:57 P.M., recovered a spent bullet from the steps to the landing.

Willie Thompson, an attendant at a service station at 5748 Delmar Boulevard, the first street to the north of Mrs. Holliman's apartment, identified defendant as the person to whom he had sold five gallons of gasoline in a metal container between 10:15 and 10:30 P.M.

After Mrs. Holliman's return to her apartment from the hospital between 11:00 and 11:15 P.M., she heard a dog barking outside. When she looked out her window, she saw defendant coming from under the house. Immediately thereafter she noticed smoke seeping through her floor and called the fire department. When the firemen arrived, Mrs. Holliman was told to leave the building. Outside she was joined by Bernice, and while they were talking to Officer John Summers (the deceased), Mrs. Holliman saw defendant on the southside of the street. He fired a shot at her which hit her coat shoulder. Both women ran back into the apartment and Officer Summers pursued defendant. The last time that either woman saw Officer Summers, he was chasing defendant between the 5773 Westminster apartment and a vacant lot to the east thereof. After defendant and the deceased disappeared behind 5773 Westminster, Mrs. Holliman heard a soft shot, like the one defendant had fired at her earlier, followed by two loud shots. Bernice heard the same reports—a soft one, like a .22 shot, followed by two loud ones.

After Officer Summers failed to answer four radio calls, a search for him was begun. Later two fellow officers found him unconscious behind 5773 Westminster. He was taken to St. Luke's Hospital where he was pronounced dead on arrival.

During the autopsy a pellet was removed from the deceased and subsequently turned over to the police laboratory. At the rear of 5773 Westminster, a police officer recovered a .22 caliber casing and Officer Summers' revolver, which held two empty shells and five live bullets.

On April 5, 1973, Charles Iison, owner of Pearlman's Sporting Goods Store, positively identified defendant as the person to whom he had sold a single shot .22 caliber rifle and one box of .22 caliber shells. According to Mr. Iison, a single shot rifle "has to be open, a shell inserted, close it, the bolt brought down and then the gun is fired. You would have to open the bolt each time it would kick the empty shell out and then stick another shell in, one shell at a time. . . . [Y]ou have to pull the bolt back each time the empty shell comes out and you put another shell in."

There is no controversy that the pellet recovered from the body of Officer Summers, the pellet on the stairwell and the shell casing recovered from the hallway and from the rear of 5763 Westminster had all been fired from the .22 caliber rifle purchased by defendant. Nor is there any controversy that the fire was of an incendiary origin. When defendant was taken into custody, he had in his possession the rifle in question. After being advised of his constitutional rights, defendant stated that he was out to get his wife because she had been seeing another man.

■ Defendant contends that the court erred in admitting testimony of his assault upon his wife and niece for the reason that these assaults were crimes for which he was not charged. Defendant admits that there are five (5) general exceptions with respect to the exclusionary rule regarding evidence of other crimes, one of the exceptions being motive. *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307 (1954); and *State v. Wing*, 455 S.W.2d 457, 464 (Mo.1970). The test as to whether evidence of other distinct crimes falls within one of the exceptions is the logical relevancy of the evidence to prove a material fact in issue. If logically relevant, the evidence is not to be rejected merely because it incidentally proves defendant guilty of another crime. On the other hand, if the court does not clearly perceive the nexus between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt and the evidence rejected. *State v. Reese*, supra, 274 S.W.2d at 307. In *Billings v. State*, 503 S.W.2d 57, 60 (Mo.App.1973), an arson case, the court found testimony that the occupant of a fire-bombed house had caused the police to raid defendant's house to be relevant to show defendant's motive for the fire-bombing. See also *State v. Hermann*, 283 S.W.2d 617, 621 (Mo.1955).

In *State v. Bolden*, 494 S.W.2d 61 (Mo. 1972), the court ruled that evidence that defendant, one month prior to the shooting for which he was convicted, had broken his wife's jaw and threatened to harm her if she reported the assault, tended to show motive and intent and was properly admitted.

■ Here defendant, when taken into custody, told the officers that he was out to get his wife. Thus, his assault upon his wife and her niece gave credibility to the officer's testimony. The fact that defendant was subdued and thwarted in his assault upon his wife would indicate the likelihood that his attempt, approximately four hours later, to burn down the building in which his wife was located was intentional and was motivated by his earlier unsuccessful efforts "to get" his wife. We rule this point against defendant.

■ The state concedes that it was error for the trial court to permit a police officer

to testify that another witness, Willie Thompson, had identified a photograph of defendant; but urges us to consider such error harmless and therefore, not prejudicial. Defendant, to support his contention in this regard, refers us to *State v. Degraffenreid*, 477 S.W.2d 57 (Mo. Banc 1972). It is true that *Degraffenreid* held that testimony by a police officer that the state's sole eyewitness to the crime had identified the defendant by means of a photograph and again in a lineup was inadmissible hearsay. On the other hand, the *Degraffenreid* court noted that an error of this sort did not in itself warrant a reversal absent a showing of prejudice to the defendant. In *Degraffenreid* the challenged testimony was intended to buttress the direct testimony of the state's only eyewitness. Here the challenged testimony was intended to buttress the circumstantial testimony of one among many witnesses. First, Mrs. Holliman testified that she saw defendant coming out from under the side of the apartment building, and then immediately she discovered smoke coming through her floor. Officer Driscoll, a member of the Fire and Arson Squad, testified that the fire had started in the basement of the apartment building and that it had been purposely set. In addition to Willie Thompson's testimony as to the identity of defendant, Thompson also identified the five gallon gasoline can, found at the scene, as the container in which he had put the gasoline. His identification of the can was based upon the pull-out spout on the top of the container. Consequently, under the circumstances shown herein—testimony that defendant was seen coming from under the apartment, and immediately thereafter smoke was seen coming through the floor; positive testimony that fire began in the basement, and that the five gallon can, debris and rags found there smelled of gasoline; and finally the testimony that the can found in the basement was the same container in which defendant had purchased the gasoline—we hold the error in the admission of the officer's testimony to be harmless.

Inasmuch as defendant's third claim that the proper foundation had not been laid for the jury's view of a black and white photograph of the deceased is unlikely to recur, the claimed error will not be discussed.

Defendant's final claim of error, that the court wrongfully and prejudicially forced him to use one of his peremptory challenges to excuse a prospective juror who should have been excluded for cause, does not admit of an easy solution. The transcript reveals the following in-court proceedings which form the basis for the defendant's claim. The following are excerpts taken from the voir dire examination:

"MR. FRIEDMAN: Is there any one of you who may have heard or read about the facts in this case before coming into the courtroom today?

"MR. LAWERENCE C. WALLACE: My son happened to be on duty at the time, plus I am a friend of the father of the deceased officer, as well as knowing him also.

"MR. FRIEDMAN: You know John Summers as well as his father?

"MR. WALLACE: Right.

"MR. FRIEDMAN: What is your son's name?

"MR. WALLACE: Lawerence Wallace, Junior.

"MR. FRIEDMAN: What District was he assigned to?

"MR. WALLACE: Union and Page.

"MR. FRIEDMAN: The same District that Officer Summers was assigned to?

"MR. WALLACE: Right.

"MR. FRIEDMAN: All right. The fact that you know—your son will not be called as a witness in this case, number one. However, the fact that you know Officer Summers and knew him and also the father of Officer Summers, would that affect your ability to be a fair and impartial juror?

"MR. WALLACE: I don't see why it should.

"MR. FRIEDMAN: You could give the State of Missouri and the defendant a fair and impartial trial and base any verdict in this case on the testimony and the evidence developed in the courtroom here?

"MR. WALLACE: Right.

"MR. FRIEDMAN: That is what we are after. Thank you.

\*     \*     \*     \*     \*     \*

"MR. BUCKLES: Mr. Wallace, you indicated that your son was on duty in the 7th District on the evening of the 5th when this occurred, correct?

"MR. WALLACE: Yes.

"MR. BUCKLES: Did you have some conversation with him about what happened? Did you talk to him about it or anything?

"MR. WALLACE: Oh, not at length. He did mention the fact that—at the time I didn't make an association with the individual that was slain—

"MR. BUCKLES: You don't remember until later—

"MR. WALLACE: Right.

"MR. BUCKLES: Do you recall if you might have talked to him the next day or some period of time later?

"MR. WALLACE: I don't see him that often. \*  \*  \*

(The following proceedings took place at the bench outside the hearing of the jury.)

"MR. BUCKLES: I would move that Juror number 566, on the second page, Mr. Lawerence C. Wallace, I ask that he be struck for cause, for the reason that he indicated that he knew Patrolman Summers personally and that he knew the father of Patrolman Summers, and his son is a police officer that is assigned to the District.

"THE COURT: Well, Mr. Buckles, *I appreciate that this man has a background*

*that he might well not be a good juror in this case,* but I as the Court don't feel that I can strike him for cause when he indicated in the questions asked by Mr. Friedman and yourself that he could be a fair and impartial juror. Now, I can't look into his mind and say that he is saying that deliberately and *I can only be governed by his answers* and under the circumstances I am going to have to deny your Motion. [Emphasis added.]

\*     \*     \*     \*     \*     \*

(The following was held outside the hearing of the Jury:)

"THE COURT: Throughout the voir dire examination several of the above average black people on this jury were aware of this crime because it involved a black policeman. They indicated that they would be fair and impartial, particularly Juror number 566, Lawerence C. Wallace, a black man. He has a son who is a policeman and knew the father of the victim in this case. He was questioned at length by both Mr. Friedman and by defense counsel and he indicated emphatically that he would listen to the evidence and give both sides a fair trial."

■ Missouri statutes provide a few specific narrow grounds requiring exclusion. §§ 546.100–546.140, RSMo 1969, V.A.M.S. In addition, § 546.150, RSMo 1969, V.A. M.S., allows generally for the exclusion of a juror who has formed an opinion on the case to the prejudice of the parties. These statutorily enumerated disqualifications are not, however, exhaustive, *State v. DeClue*, 400 S.W.2d 50, 56 (Mo.1968), and ".  .  . if for any reason, statutory or otherwise, a venireman is not in a position to enter the jury box with an open mind, free from bias or prejudice, he is not a competent juror .  .  ." *Kendall v. Prudential Life Ins. Co. of America*, 319 S.W.2d 1, 5 (Mo.App. 1958), rev'd on other grounds 327 S.W.2d 174 (Mo. Banc 1959). In this area beyond the statutory exclusions, the trial judge is given a broad discretion to rule on the qualifications of jurors.

The challenged juror in the present case is not excluded under any of the specific statutory sections. The propriety of his inclusion as a juror must, therefore, be evaluated under the general test enunciated in a long line of Missouri cases.[1] Under these cases, the decision of the trial judge is reversible only for an abuse of discretion and "all doubts should be resolved in favor of the finding of the trial court. . . ." *State v. Wilson*, 436 S.W.2d 633, 637 (Mo.1969). This approach may often result in a less than rigorous appellate analysis. The standard of review to be applied by an appellate court in most situations has been further described as:

> " ' . . . on review by an appellate court, unless there is some fact which, we reasonably can say, in and of itself, necessarily showed prejudice, or unless there is an admission of prejudice, past or present, or unless there is something in the demeanor of the venireman which, despite his actual words, discloses the existence of prejudice in fact, we should not convict the trial court of an abuse of discretion in overruling a challenge for cause. . . .' " (*Leavitt v. St. Louis Public Service Co.*, 340 S.W.2d 131, 136 (Mo.App.1960) and *Moss v. Mindlin's Inc.*, 301 S.W.2d 761, 771–2 (Mo.1957))

The broad discretion granted to the trial judge must be predicated on a requirement that the trial judge carefully consider the responses of the individual jurors on voir dire in order to be able to make a factual determination as to the competency of an individual challenged juror. The decision of the judge should be based on facts stated by the juror not on conclusions of the juror himself as to his ability to act impartially, *State v. Lovell*, 506 S.W.2d 441, 444 (Mo. Banc 1974); *State v. Land*, 478 S.W.2d 290, 292 (Mo.1972) and *Theobald v. St. Louis Transit Co.*, 191 Mo. 395, 90 S.W. 354, 359 (Mo.1905). In its brief, the state suggests that this duty of the trial judge

exists only where the prospective juror on voir dire admits a possibility of prejudice. No cases are cited in support of this proposition and our research reveals none. In addition, it seems to us that such a test would be directly contrary to the stated rule. The independent evaluation to be made by the trial judge and his unique opportunity to make such an evaluation because of his ability to observe the juror's demeanor justify the broad grant of discretion, *State v. Wraggs*, 512 S.W.2d 257, 259 (Mo.App.1974), *State v. Harris*, 425 S.W.2d 148, 155 (Mo.1968), and a proportionally narrowed appellate review. Evidence of the lack of such an examination by the trial judge may well justify a more searching consideration by the appellate court of the appropriateness of excluding the individual juror. In the present case, the record does not reveal an independent factual determination by the trial judge. To the contrary, the transcript reveals that the judge recognized some possible problem with the impartiality of the challenged juror but felt unable to exclude the juror because of his claimed ability to be impartial. As previously noted, the case law reveals that the judge's hands were not so tied.

In connection with this requirement of a factual finding by the trial judge, we initially note the approach of the Missouri Supreme Court in *State v. Land*, supra. In *Land*, the court reversed the trial court's decision to include the juror. The reversal was based on the *Land's* court's observation that at one point in the record of the trial the judge recognized the possibility that the juror might subconsciously lean toward the state, *State v. Land*, supra at 291, 292. Despite the state's argument that the statement by the trial judge was not the ultimate finding as to the competency of the juror, the *Land* court held that ". . . Deference to the action of the trial court is no longer in the picture after such a factual finding, and . . . it was an abuse of discretion not to have sustained appellant's

---

1. See cases collected at Mo.Digest, Criminal Law ⚖1152(2).

challenge . . . for cause. . . ." *State v. Land,* supra, at 293. The situation in the present case may parallel that in *Land.* As previously noted, the trial judge in our case did recognize some possible problems with the impartiality of the challenged juror.

■ Alternatively because of the failure of the trial judge to base his decision to include the juror on the required factual determination, we must subject the qualifications of the challenged juror in the present case to a searching consideration. The situation here was fraught with potential prejudice. The juror was a friend of the deceased's father, knew the deceased policeman himself and was the father of a policeman who worked with the deceased. Affiliation or connection with law enforcement alone is not enough reason to sustain a challenge for cause. *State v. Wraggs,* supra, at 258; *State v. Cashman,* 485 S.W.2d 431, 434 (Mo.1972). It has also been suggested that acquaintance with interested parties may be insufficient in itself to require exclusion. In *Grimm v. Gargis,* 303 S.W.2d 43, 49–50 (Mo.1957), a civil case, a ". . . [j]uror . . . had known plaintiff for thirty years and had played ball with him as a child. . . ." The juror also inadvertently visited and talked with the plaintiff in the hospital the day following the accident. *Grimm* seems distinguishable, however, on several grounds. First, in *Grimm,* on voir dire the challenged juror, without any hesitation, disavowed the existence of any previously held opinion or prejudice. The juror's answers in the present case are more equivocal. Secondly, in *Grimm,* the affirmance of the trial judge's decision to refuse exclusion was based on the broad discretion of the trial judge. *Grimm v. Gargis,* supra, at 50. Our earlier discussion of the underlying rationale for such a grant of discretion as applied to the present case does not justify such a disposition here. Finally, and most importantly, there is a great difference in the nature of the *Grimm* case and the present

case. *Grimm* was a personal injury case; here the defendant was on trial for the murder of a policeman. Not only was the challenged juror here a friend of the deceased's family and the father of a man subjected daily to the same danger of death, but also his son was an officer assigned to the same police district. Our conclusion that exclusion of the challenged juror was required here is not based simply on his status. That status, however, should spur a more cautious appraisal of the juror's qualifications. A juror with the acknowledged close personal ties to persons involved in the litigation hardly seems desirable as a member of the impartial body of jurors. We emphasize that " '. . . [e]ach case must be judged on the particular facts in that case'. . . ." *State v. Land,* supra, at 292; *State v. DeClue,* supra, at 57; *State v. Harris,* supra, at 155; and *State v. Spidle,* 413 S.W.2d 509, 513 (Mo. 1967).

The case of *State v. Jackson,* 43 N.J. 148, 203 A.2d 1, 11 A.L.R.3d 841 (1964), cert. denied 379 U.S. 982, 85 S.Ct. 690, 13 L.Ed.2d 572 (1965), although not exactly analogous to our case, illustrates several important rationales which underlie our discussion. In *Jackson,* defendants were convicted of murder in the first degree. During the voir dire examination the court rejected defendant's challenge for cause of a prospective juror who stated on examination that members of the police department were his neighbors and friends, and that one detective, whom he knew, was an important state's witness. In reversing the conviction, the court stated that the prospective juror's statement that his friendship with the detective would have no bearing on the issue of the latter's credibility, even though sincerely made, was contrary to human nature.

■ More important here than what *Jackson* held were certain comments contained therein: (1) that the sound administration of justice dictates that the means as well as the end be just; and where serious

trial error has undermined the proceedings, there must be a reversal without regard to our view of guilt; (2) that jurors must be carefully selected with an eye toward their ability to determine controverted issues fairly and impartially, and the trial court must see that the jury is as nearly impartial as the lot of humanity will admit; (3) that the fundamental right of trial by a fair and impartial jury is jealously guarded by the courts. The jury is an integral part of the court for the administration of justice and . . . the parties to the action are entitled to have each of the jurors who hears the case impartial, unprejudiced, and free from improper influences; and (4) as pointed out by Judge Murrah, in the course of his opinion for reversal, in *United States v. Chapman,* 158 F.2d 417, 421 (10 Cir., 1946), where the government's challenge for cause had been overruled, impartiality is not a technical concept and a party's right to a fair and impartial trial is to be resolved in accordance with high standards of human conduct. Judge Murrah further noted (1) that when a juror testifies that he believes he can, and the court finds as a matter of fact that he will, if selected, render an impartial verdict on the evidence, he is an impartial juror as required by law; (2) that a juror's answer to questions touching his state of mind is primary evidence of his competency, but the ultimate *question is a judicial one for the court to decide,* and *in case of doubt, justice demands that the challenge be allowed*; (3) that only by a punctilious regard for a suspicion of prejudice can we hope to maintain the high tradition of our jury system; and (4) that we must make sure that lamentations of the unsuccessful litigant are without foundation, either in fact or circumstance. (Emphasis added.)

In the desire to ". . . make our system of selecting jurors respected and free from prejudice or the suspicion thereof. . . ." [*Kendall v. Prudential Life Ins. Co. of America,* supra, at 8; see also *Crawford v. United States,* 212 U.S. 183, 29 S.Ct. 260, 53 L.Ed. 465 (1909)], the challenged juror in the present case should have been excluded for cause. Because of the decision of the trial court here, the defendant was required to utilize a peremptory challenge to exclude the juror. The defendant is entitled to a full panel of qualified jurors before utilizing his peremptory challenges. *State v. Lovell,* supra, at 443; *State v. Land,* supra, at 292; and *State v. Foley,* 144 Mo. 600, 46 S.W. 733, 735 (1898). Denial of the defendant's legitimate request for exclusion of the challenged juror was reversible error, *State v. Lovell,* supra, at 444; *State v. Spidle,* supra; and *State v. DeClue,* supra, and we so hold.

In summary, inasmuch as this cause was tried before one of the most able and experienced trial judges, we are extremely reluctant to reverse and remand this cause for a new trial in view of the evidence, but we are convinced that under the cumulative circumstances relating to the juror, Mr. Wallace, the defendant is entitled to a new trial.

Under our Anglo-American system, every person is entitled to certain basic guarantees of a fair trial. Every person is entitled to fundamental fairness and fair play. Basic rights include not only the right to counsel and public trial, the right to be free from the use of unlawfully seized evidence, the right to be free from the use of an unlawfully obtained confession, but also include the right to a fair and impartial jury. Our system is based upon the concept of a trial by an impartial jury. Impartiality is implicit in the right to trial by jury. We are committed to the doctrine that certain practices must not "offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." *Rochin v. California,* 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952).

While this case is neither a judgment case as set out in *Lovell* and *Land*; nor a statu-

tory proscription case which disqualifies a particular juror, it is a case involving relationships and other factors which can be equally invidious and prejudicial. The issue in the instant case is not whether the jury that decided the case against defendant was prejudiced and thereby defendant was denied a fair trial, but rather, whether or not defendant was entitled to a fair, impartial jury panel from which to select the final petit jury to determine his case. Guarantee of such a fair and impartial jury panel has always been the law and policy of the State of Missouri.

We cannot subscribe to the view that Mr. Wallace could be a fair and impartial juror even though he indicated that he could try the case fairly and justly: He knew the victim—a policeman; he was better acquainted with the victim's father; his son was not only a policeman but a policeman in the same district as the victim; he discussed the case with his son. Even though he stated consciously that he could give a fair trial to the state and to the defendant, his preconceptions and his underlying attitudes must have been such, as a normal, living father, that it would be extremely difficult for him not to be influenced.

The average man in the community would, we believe, hold that under such circumstances the defendant was not tried by an impartial jury of twelve persons.

Not only should a jury which hears a criminal case and which has great power be impartial in fact, but also if we are to hold true to our ideals and retain the confidence of the community, the jury should also give every outward appearance of impartiality. We do not believe that this was accomplished in this case.

On retrial of this cause, in the event defendant is found to be guilty of both charges, the court will be guided by the case of *State v. Baker*, 524 S.W.2d 122 (Mo. Banc 1975), in its pronouncement of sentences.

Judgment reversed and remanded for a new trial.

SIMEONE, P. J., concurs in separate concurring opinion.

GUNN, J., concurs in result and concurs in separate concurring opinion by SIMEONE, J.

SIMEONE, Presiding Judge (concurring).

I concur with Judge McMillian that this cause should be reversed and remanded for a new trial because the trial court failed to sustain the defendant's challenge to venireman Lawerence C. Wallace. I do so for two reasons.

First, the State of Missouri has always been committed to the doctrine that a defendant in a criminal case is entitled to a full panel of *qualified* jurors before he is required to make a peremptory challenge. *State v. Foley*, 144 Mo. 600, 46 S.W. 733, 735 (1898); *State v. Lovell*, 506 S.W.2d 441, 443 (Mo. Banc 1974). While some have suggested that if a particular venireman does not actually serve on the jury which hears the cause, justice has been served, *State v. Land*, 478 S.W.2d 290, 292 (Mo.1972), our Supreme Court has adhered to the traditional principle and has stated that "we need not change our course at this time." *State v. Land*, supra, 478 S.W.2d at 292. I believe that this principle should be reexamined, but until it is, we are bound by the principle adhered to throughout our history. Hence, it is clear to me that the defendant was entitled to a full panel of qualified jurors before he is required to utilize a peremptory challenge.

Second, under our system of jurisprudence there is no feature of a trial more necessary to the pure and just administration of the law than that every litigant should be accorded a fair trial before a jury of his countrymen who enter upon the trial totally disinterested and wholly unprejudiced. *Theobald v. St. Louis Transit Co.*,

191 Mo. 395, 90 S.W. 354, 359 (1905). And if for any reason, statutory or otherwise, a venireman is not in a position to enter the jury box with an open mind, free from any bias, he is not a competent juror. We cannot and should not lightly disturb the finding of the trial court. Necessarily broad discretion must be vested in the trial court. "With a cross-section of society appearing as veniremen, an area is involved that not only cannot but should not be standardized. Recognition of this fact requires that there continue to be a broad discretion in the trial court . . . ." *State v. Land,* supra, 478 S.W.2d at 292. The test on appeal is that the ruling of the trial court will not be disturbed unless it is manifestly against the record of the voir dire examination. *State v. Lovell,* supra, 506 S.W.2d at 444.

In my opinion, no one of the factors regarding the qualifications of the venireman, Mr. Wallace, would be sufficient to sustain a challenge for cause. That is, I believe that, although Mr. Wallace knew the deceased, was acquainted with his father and had a son who was a policeman assigned to the same district as the deceased, each of these factors standing alone would not be sufficient to sustain a challenge for cause. When these factors are accumulated and added to the fact that the venireman discussed the matter with his son, then in my opinion, they are sufficient to require that the challenge for cause should have been sustained, despite Mr. Wallace's assurance that he could render a fair and impartial verdict. The decision of the trial court must rest on facts stated by the venireman and does not depend upon the conclusion of the juror as to whether he could divest himself of any actual or subconscious bias. *State v. Lovell,* supra, 506 S.W.2d at 444; *State v. Jones,* 384 S.W.2d 554, 558 (Mo. 1964).

As stated above, under our system of jurisprudence a cause is to be tried by persons who are free from partiality or bias for or against the litigants. The whole spirit of Anglo-American jurisprudence is stated by Lord Mansfield: " '[A juror] should be superior even to a suspicion of partiality.' " *Billmeyer v. St. Louis Transit Co.,* 108 Mo. App. 6, 82 S.W. 536, 537 (1904).

In view of the cumulative facts on this record, I agree with Judge McMillian that the cause should be reversed and remanded for a new trial.