**STATE of Missouri, Plaintiff-Respondent,**

v.

**Jardee CARTER, Defendant-Appellant.**

**No. 37384.**

Missouri Court of Appeals,
St. Louis District,
Division Two.

Nov. 30, 1976.

Timothy Braun, Asst. Public Defender, Clayton, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, Sam C. Bertolet, Asst. Pros. Atty., St. Louis County, Clayton, for plaintiff-respondent.

McMILLIAN, Presiding Judge.

Defendant appeals from a judgment of conviction entered upon a jury verdict finding him guilty of stealing property valued over $50, § 560.156, RSMo 1969. A sentence of five (5) years imprisonment was imposed by the trial court under the Second Offender Act, § 556.280, RSMo 1969. We reverse and remand for a new trial.

On appeal, defendant raises three basic contentions. First, he alleges error in the trial court's failure to sustain his challenge for cause of a juror. Secondly, he contends that certain comments by the prosecutor during closing argument were beyond the scope of the evidence and constituted plain error. Thirdly, appellant launches a multi-pronged attack on § 560.156, RSMo 1969, on the basis that the failure of the statute to define "value" makes it unconstitutionally vague. Building on this premise, appellant argues that the vagueness should be resolved in his favor and, therefore, that only evidence as to wholesale cost rather than retail price was properly admissible. Comments in the prosecutor's closing argument, made over appellant's objections, directing the jury's attention to retail price and to merchandising costs incurred by the retail store as properly considered in establishing a "value" of over $50 are cited as further examples of the injection of inadmissible material.

We find error in the trial court's ruling on the prospective juror and, therefore, reverse the conviction. The other contentions of appellant will be discussed summarily for purposes of retrial.

On February 22, 1975, a security guard at a Kroger grocery store observed the appellant remove five bottles of Johnny Walker Red Label Scotch and three bottles of Canadian Club whiskey from a shelf, place them under his coat, and leave the store without paying for them. The security guard took appellant into custody as soon as he left the store. Over appellant's continuing objection that evidence as to retail value was inadmissible, evidence was introduced that the retail price of the five bottles of Johnny Walker Red Label Scotch was valued at $7.19 each, that two of the three bottles of Canadian Club whiskey retailed at $7.49 each with the one remaining bottle of Canadian Club whiskey retailing at $7.29. The aggregate retail value, therefore, was $58.22. Witnesses for the state also established that the absolute "rock-bottom" cost of the stolen liquor was $50.10. This figure was derived from wholesale cost agreements between Kroger and the liquor distributors. The cost agreements reflected wholesale costs to Kroger of $6.18 each for the Johnny Walker Red Label Scotch as of December 16, 1974 and $6.40 each for the Canadian Club whiskey as of August 19, 1974. Since Kroger utilized no serial number inventory control system for liquor, the witnesses were unable to state whether the particular bottles stolen were purchased pursuant to these particular wholesale cost

agreements or at an earlier date. The witnesses noted that the wholesale cost of liquor had been rising at a rate of 4% to 5% per year and that if any of the bottles were purchased prior to the date of the wholesale cost agreements referred to, the wholesale cost would, therefore, have been lower.

In a spirited closing argument, the prosecutor, over defendant's objection, discussed with the jury not only the "rock-bottom" wholesale cost and the retail price but also suggested that the actual cost to Kroger of the merchandise had to exceed $50.10 because Kroger incurred merchandising costs. Without objection by the defendant, the prosecutor then made reference to skyrocketing prices and the jury's opportunity to combat that problem by convicting this defendant. Also, without objection by the defendant, the prosecutor emphasized the seriousness of the offense suggesting that the security guard had been in danger while apprehending the defendant. Finally, the state's attorney noted that sympathy for the defendant was not warranted in this case because the defendant was not "the kind of man who is down on his luck and is stealing a little money to keep his kids going." These latter comments and others of a similar nature are cited by the defendant as improper personalization of the argument to the jury and as beyond the scope of the evidence. Relief under the plain error rule is sought.

During the voir dire examination, defendant moved to strike a juror for cause based on the following exchange. In the course of the initial general questioning of all of the jurors, the following transpired:

"Q. Mr. Whaley, how long have you been married?

"A. I've been married, let's see, 11 years.

"Q. Do you have children?

"A. I have one stepdaughter, 15.

"Q. You're personnel supervisor for General Motors on Union?

"A. Yes, sir.

"Q. Okay. Now, I'm sure in that job you run across many people with many types backgrounds. Have you ever had to talk or come across the criminal justice system in your job? I mean, talk to people, the police about people's records?

"A. Yes.

"Q. Do you have any preconceived notions about the criminal justice system that would affect your judgment here.

"A. No, I don't believe so."

Later, Mr. Whaley was asked the following questions:

"MR. BRAUN: All right. Now, have any of you or a member of your family or any close friend of your family, somebody that you're pretty close to, ever been in law enforcement, military or civilian, and that includes like the FBI, any security agency, treasury agent or other, or been employed by a law enforcement agency as a civilian or employed as a private security guard or with a private security agency?

\*　　\*　　\*　　\*　　\*　　\*

"MR. BRAUN: Mr. Whaley.

"MR. WHALEY: Yes. For three years prior to going to work for General Motors I was on the St. Louis Police Department as a patrolman.

"MR. BRAUN: Now, as a former policeman do you think you can sit on a criminal case with an open mind?

"MR. WHALEY: I would like to say yes, I think I can, but, I mean, it's been nine years.

"MR. BRAUN: You're not sure?

"MR. WHALEY: No, I couldn't say one way or another if it would affect me or not. I can't say positively.

"MR. BRAUN: Deep in your heart do you feel you could be honest and impartial?·

"MR. WHALEY: Yes, I do. I do believe that.

"MR. BRAUN: Okay. Any others?

Later, the following occurred:

"MR. BRAUN: Now, some of State's witnesses will be security officers and Maplewood police officers. Now, I'm go-

ing to ask you this specifically, Mr. Whaley—not to put you on the spot—but as a former police officer and just a human being, would you be more inclined to believe the testimony of a security officer or policemen just because of their position?

"MR. WHALEY: There's a possibility there.

"MR. BRAUN: That you would be inclined to believe them?

"MR. WHALEY: Right.

"MR. BRAUN: Your Honor, I'd like to have him stricken for cause.

"THE COURT: Request will be denied."

Finally, the following exchange transpired:

"MR. BRAUN: All right. Now just because the police think a man is guilty that doesn't mean he necessarily is guilty. Does anybody have any problem with that?

"MR. Whaley, would you have any problem if a policeman thought the man was guilty?

"MR. WHALEY: Not at all.

"MR. BRAUN: Mr. Whaley, have you ever testified in a criminal case?

"MR. WHALEY: Yes, I have.

"MR BRAUN: About how many times?

"MR. WHALEY: Five or six times.

"MR. BRAUN: Have you ever testified (sic) in a criminal trial?

"MR. WHALEY: Yes, I did.

"MR. BRAUN: What was the outcome of those trials?

"MR. WHALEY: It was a conviction.

"MR. BRAUN: Just one time you testified in a trial?

"MR. WHALEY: Right. The one conviction, right.

"MR. BRAUN: All right."

As a result of the trial court's denial of defendant's motion to strike Juror Whaley for cause, the defendant was forced to expend one of his peremptory strikes to remove the juror. It is well-established in Missouri that the defendant is entitled to a full panel of qualified jurors before the exercise of his peremptory challenges, *State v. Lovell,* 506 S.W.2d 441, 443 (Mo.banc 1974); *State v. Land,* 478 S.W.2d 290, 292 (Mo.1972). To create this panel of qualified jurors, persons within the specific statutory exclusions must, of course, be deleted, §§ 546.110, 546.120, 546.140, 546.150, RSMo 1969. The specific statutory exclusions, however, are not exhaustive, *State v. De-Clue,* 400 S.W.2d 50, 56 (Mo.1968) and ". . if for any reason, statutory or otherwise, a venireman is not in a position to enter the jury box with an open mind, free from bias or prejudice, he is not a competent juror . . .." *Kendall v. Prudential Life Ins. Co. of America,* 319 S.W.2d 1, 5 (Mo.App. 1958), rev'd on other grounds, 327 S.W.2d 174 (Mo.banc 1959). In the present case, a careful consideration of the entire voir dire examination of Whaley reveals great uncertainty in the juror's mind as to his ability to be impartial because of his past association with law enforcement. We recognize that the exclusion of jurors is a matter within the sound discretion of the trial judge, *State v. Cuckovich,* 485 S.W.2d 16, 22–23 (Mo.banc 1972). We also note, however, that the language of the Supreme Court in *State v. Lovell,* supra, at 444, is as follows:

". . . In exercising this discretion, the decision of the trial court should rest upon the facts stated by the juror with reference to his state of mind and should not be allowed to depend upon the conclusions of the juror whether he could or would divest himself of a prejudice he admitted to exist in his mind. . . ."

From the transcript in the present case, we can discover no such basis for the trial judge's exercise of discretion. In the presence of equivocal answers by the prospective juror, the trial judge made no effort to question the juror to explore possible prejudice. The present case is, therefore, distinguishable from the two cases relied upon by the state. In both *State v. Cuckovich,* supra, and *State v. Drake,* 518 S.W.2d 335 (Mo.App.1975), equivocal responses by the prospective jurors were withdrawn when the trial judges clarified the questions propounded by counsel.

In deciding that Juror Whaley should have been excluded for cause, we reiterate our position stated in *State v. Holliman*, 529 S.W.2d 932, 942 (Mo.App. 1975):

> "Not only should a jury which hears a criminal case and which has great power be impartial in fact, but also if we are to hold true to our ideals and retain the confidence of the community, the jury should also give every outward appearance of impartiality."

One final comment seems appropriate. In our opinion, retention of a juror as questionable as Juror Whaley and the resulting necessity for a new trial is an illogical expenditure of the citizenry's time and money in light of the large pool of potential jurors made available for service in criminal cases. Errors in the exclusion of potential jurors should always be made on the side of caution. See also *State v. Gordon*, 543 S.W.2d 553, No. 28173 (Mo.App. KCD 1976).

The most interesting of the other contentions of the defendant is the claim that the statutory section under which he was prosecuted, § 560.156, RSMo 1969, is unconstitutionally vague because it fails to define "value" and, therefore, is not "sufficiently explicit to inform those who are subject to it of what constitutes a violation of the statute." To support this contention, defendant directs our attention to numerous cases in which diverse evidentiary approaches were approved as properly establishing "value," see, e.g., *State v. Bevelle*, 527 S.W.2d 657, 660 (Mo.App.1975); *State v. Morse*, 514 S.W.2d 375, 376–77 (Mo.App. 1974); *State v. Matzker*, 500 S.W.2d 54, 57 (Mo.App.1973). Rather than illustrating unconstitutional vagueness, however, we feel that the numerous cases demonstrate that "value" is properly defined situationally. This analysis is not inconsistent with the suggestion by the state that "value" has been judicially defined in Missouri to be "open market value," see, e.g., *State v. Armstrong*, 361 S.W.2d 811, 817 (Mo.1962); *State v. McCarthy*, 336 S.W.2d 411 (Mo. 1960). Our analysis simply recognizes that the quantum of loss to a particular victim may vary in terms of whether that victim acquired the product in a wholesale or retail marketplace. On the other hand, we disagree with defendant that evidence of retail price is not relevant to the question of loss to the victim. We do not deny that retail price is simply an expectancy, an amount the owner hopes to receive for the item in the future. Nor do we deny that the profit factor included in retail prices can be arbitrarily inflated or deflated by the merchant, and therefore, not realistically represent a true value to the victim. From this alone, however, we cannot conclude that evidence of retail price is not some evidence of market value which we believe is the true test.[1]

In *Maisel v. People*, 166 Colo. 161, 442 P.2d 399 (1968), where the owner of the property testified to the retail price of eight hunting knives, six pocket knives, two straight razors, and two transistor radios, which had been stolen by the defendant, the court posed the question:

> "Is evidence of retail price evidence of market value? We conclude that it is, especially where as in the instant case we are dealing with items which were being sold over the counter on a more-or-less

---

1. 50 Am.Jur.2d, Larceny, § 45, p. 209

   "*Ascertainment of value of property taken.*

   "In distinguishing between grand and petit larceny where the classification rests on value, the rules which establish value in civil cases have been held applicable. Thus, in the case of common articles having a market value, the courts have usually rejected the original cost and any special value to the owner personally as standards of value for purposes of graduation of the offense, and have declared the proper criterion to be the price which the subject of the larceny would bring in open market—its 'market value' or its 'reasonable selling price,' at the time and place of the theft, and in the condition in which it was when the thief commenced the acts culminating in the larceny. Moreover, for the purpose of determining the grade of larceny, the value of property stolen is its reasonable market value rather than its fixed or controlled price. Fair market value does not depend solely on the wholesale or cost price of the goods taken, but is affected by the retail price as well, and it has been held that the wholesale and retail prices, established by experts if necessary, may fix the range within which the jury may determine fair market value.   .   .   ."

daily basis, and there is nothing to indicate that the retail price is higher than the true market value.

"In *People v. Irrizari*, 5 N.Y.2d 142, 182 N.Y.S.2d 361, 156 N.E.2d 69, the New York Court of Appeals was faced with a similar situation. There some suits were stolen from a department store and the owner thereof was permitted to testify as to the wholesale price and the retail price of each suit. In holding that evidence as to retail price was proper, the New York Court of Appeals stated as follows:

'In short, market value, as the term is used in section 1305, denotes not the value of the goods in the market in which the owner had purchased them or in which he could replace them, *but the value in the market in which the goods were being traded, namely, the price at which they would probably have been sold in the regular course of business* at the time when and place where they were stolen. And so, we note, the courts have held in a number of other jurisdictions where the market value is likewise the criterion for determining the value of stolen property.'

. . .

"Similarly in *Lauder v. State*, 233 Md. 142, 195 A.2d 610, the Court of Appeals of Maryland stated that in the case of a stolen tape recorder, the State had the burden of proving its value and the 'test is market value, and particularly retail value.' So, the reasoning in both the *Irrizari* and *Lauder* cases is that in the absence of any evidence to the contrary, evidence of retail price is not only admissible but is perhaps the best evidence of market value."

Consequently, we hold that in cases involving the theft of personal property the value of the property taken shall be the fair market value or its reasonable selling price at the time and place of the theft. Fair market value, as thus determined, may or may not be either the wholesale cost or the retail price. Inasmuch as retail price, as well as wholesale cost, does shed light upon fair market value, both have some relevancy in determining fair market value. Thus the

prosecutor's argument in this respect was not error. See also *State v. Gordon*, 543 S.W.2d 553, No. 28173 (Mo.App. KCD 1976).

Defendant's remaining complaints relating to prosecutorial comments personalizing the jury argument and going beyond the scope of the evidence may be simply answered by our expression of confidence that the prosecutor will be more circumspect on retrial.

The judgment of the trial court is reversed and remanded for a new trial.

STEWART and RENDLEN, JJ., concur.