STATE of Missouri,
Plaintiff-Respondent,

v.

Robert BARKS, Defendant-Appellant.

No. 50129.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 29, 1986.

Motion for Rehearing and/or Transfer
Denied June 4, 1986.

Application for Transfer Denied
July 15, 1986.

Charles M. Shaw, Clayton, for defendant-appellant.

John Munson Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PUDLOWSKI, Judge.

Appellant was convicted by a jury of attempted stealing of an automobile, RSMo Section 564.011 (1978). The Circuit Court of Jefferson County entered judgment on the jury's verdict and sentenced him as a persistent offender to a term of eight years in the Missouri Department of Corrections. On appeal, appellant charges that the trial court committed reversible error in (1) failing to strike for cause three veniremen, thereby denying appellant his right to a full panel of qualified jurors before the exercise of his peremptory challenges; (2) not granting appellant's motion for a judgment of acquittal based on the insufficiency of the evidence; (3) not granting appellant's motion to suppress evidence; and (4) submitting an incorrect jury instruction. We affirm.

During voir dire, the prosecutor questioned four veniremen about their acquaintance with Deputy Sheriff Chris Pigg and Lieutenant Ed Kemp of the Jefferson County Sheriff's Department.

MR. BOUCHARD: Deputy Chris Pigg will be testifying in the trial of this case. Anyone know Deputy Pigg?

Mr. Crump, how do you know Deputy Pigg?

MR. CRUMP: He's a good friend of mine.

MR. BOUCHARD: Do you feel that, given the fact that Mr. Pigg is a good friend of yours—. First off, how often do you see him?

MR. CRUMP: Run around together.

MR. BOUCHARD: Do you still do that?

MR. CRUMP: Him and my brother are pretty good friends. We all run around together.

MR. BOUCHARD: Do you think that you could put that aside and if Deputy Pigg testifies in this case, do you believe that you can evaluate his testimony fairly and impartially, the same way you can any other witness' testimony who will take the stand to testify?

MR. CRUMP: Yes, sir.

MR. BOUCHARD: So, you don't feel that you would have any problems with that at all?

MR. CRUMP: No.

MR. BOUCHARD: You can set that aside?

MR. CRUMP: Hopefully, yes.

MR. BOUCHARD: Anyone else here?

MR. STOTLER: William Stotler.

MR. BOUCHARD: Do you know Deputy Pigg?

MR. STOTLER: Chris Pigg was a student where I teach.

MR. BOUCHARD: How long ago was that?

MR. STOTLER: About ten years ago.

MR. BOUCHARD: Was he a student of yours?

MR. STOTLER: Yes, he was.

MR. BOUCHARD: Was that just like a one-hour class or what?

MR. STOTLER: Well, we also had an association as coach and player. I coached at the time, and Chris was a player.

Q. That was what, football?

A. Basketball.

Q. Chris was in basketball?

A. He was a little younger then.

Q. He's a little heavyset now. Due to the fact that you know Chris, coached him on the basketball team, could you put that aside and evaluate his testimony fairly and impartially, the same as you would any other witness in the case?

A. I think so.

Q. Any doubt about that at all?

A. No doubt.

Q. Anyone else? Mr. Forester, do you know Chris?

A. He went to school with my daughter.

Q. And about how long ago was that?

A. I don't know.

Q. Ten years ago?

A. Ten years ago.

Q. Is there anything about that situation that would cause you to have any problems in being fair and impartial?

A. No.

*    *    *    *    *    *

Anyone know Lieutenant Ed Kemp? He's with the Jefferson County Sheriff's Department, has been for a number of years; he's a big, big person. Anyone here know Ed Kemp?

Mrs. Blake, how do you know Ed Kemp?

A. Well, I've known him for about 28 years; since he was a child.

Q. Do you know him through his parents? Is that how you met him?

A. Yes.

Q. Are you still friends with his parents?

A. Yes.

Q. Do you still see Lieutenant Kemp on a regular basis?

A. No.

Q. Is there anything about the fact that you know Lieutenant Kemp through his parents and have for a long time that would cause you to have any problems in evaluating his testimony in the same manner as you would anyone else who would appear in the trial of this case?

A. No.

Q. You can put that aside?

A. Yes.

Q. No problem at all?

A. No problem.

*    *    *    *    *    *

Later, the defense counsel questioned the four veniremen.

MR. SHAW.

Q. Mr. Stotler, where are you from originally?

A. Bonne Terre, Missouri.

Q. Did you get your early schooling in St. Francois County?

A. Yes, I did.

Q. You have been in Jefferson County for some time?

A. Yes, sir.

Q. And where is it that you teach?

A. Herculaneum, Missouri.

Q. I don't believe that Officer Pigg said at any time that this man did anything. He's an officer in the case and in the investigation. I believe he made the arrest, and he's a student or was a student of yours and apparently you were a coach.

Now, do you feel that you would want him to convict somebody just because he's testifying in behalf of the State in this case?

A. No, I don't.

Q. It's got to be proved and proved beyond a reasonable doubt; is that correct?

A. Yes.

Q. Was he a good basketball player, or do you remember?

THE COURT: You don't have to answer that.

A. I'll refrain from answering that.

Q. You know of no reason why you couldn't give either party a just, fair and impartial trial?

A. No.

*    *    *    *    *    *

Q. Ms. Black [sic] you say you've known Lieutenant Kemp since he was a child?

A. Yes, sir.

Q. That has nothing to do with anything, does it, in this case?

A. Not that I know of.

Q. Either the evidence proves Bob Barks to be guilty and proved beyond a reasonable doubt so that you are firmly convinced of it; otherwise he's not guilty; is that correct?

A. That's right.

Q. And that wouldn't be a blow against Lieutenant Kemp or anybody else; would it?

A. No.

Q. It would just not be proved, and that's that?

A. That's right.

\* \* \* \* \* \*

Q. Mr. Forester, where are you from originally?

A. Eastern part of Jefferson County.

Q. How long have you known Officer Pigg?

A. My daughter went all through school with him.

Q. That's the only way you know him?

A. And I know some of his family.

Q. Oh, you know some of his family?

A. Yes, sir.

Q. Have you ever talked to him about any of his cases?

A. No, sir.

Q. Of course, you didn't even know this case existed before you got here today?

A. Right.

\* \* \* \* \* \*

Q. Mr. Crump, where are you from originally?

A. Festus, Jefferson County.

Q. And you have known Officer Pigg for about how long?

A. Since he was a freshman in high school.

Q. Do you ever talk to him about any of his cases that he has?

A. Not that I can recall.

Q. When do you think the last time was that you spoke with him?

A. Just about a month and a half, about two months ago.

Q. I'm sure, but I'll ask; he didn't mention anything about that particular commuter lot, did he?

A. No, sir. Chris never talks about his job with us.

Q. As far as you're concerned, you know of no reason why you couldn't be fair, just and impartial; is that right?

A. That's right.

Afterwards, the trial court overruled appellant's motion to strike Veniremen Stotler and Blake for cause on the grounds that it believed that they could set aside their prior associations and could listen to the evidence fairly and impartially. The trial court also overruled appellant's motion to strike Venireman Forrester because Mr. Forrester had never responded in any way as to his personal association with Officer Pigg and that his answers did not indicate prejudice. The trial court excused Venireman Crump because of the closeness of his relationship with Officer Pigg and because he was ambiguous as to whether he could set it aside.

It is well settled that a defendant in a criminal trial is entitled to a full panel of qualified jurors before he is required to make peremptory challenges. Nevertheless, the trial court is vested with broad discretion in determining the qualifications of a venireman and its decision on challenges for cause will be disturbed only upon a showing of a clear abuse of discretion and real probability of injury to the complaining party. *State v. Smith*, 649 S.W.2d 417, 422 (Mo. banc 1983), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983).

A relationship with police officers is not sufficient, standing alone, to disqualify a juror. *State v. Walton*, 703 S.W.2d 540, 541 (Mo.App.1985). In this case, one venireman, Crump, had a close, on going relationship with the state's key witness, Officer Pigg. Despite Crump's stated willingness to be fair and impartial, the trial court properly struck him from the jury. However, the relationships of the three challenged veniremen with the two police witnesses were not as close. Further, with

one momentary exception, all three venire-men clearly stated that they would be fair and impartial and would weigh the officer's testimony in the same way as other witnesses.

Venireman Stotler, when first asked if he could fairly and impartially evaluate Officer Pigg's testimony replied "I think so." After that response, however, he was clear and unequivocal, replying to the prosecutor that he had "[n]o doubt." He similarly informed the defense counsel of that three times. Responses by Veniremen Blake and Forrester demonstrated the same lack of equivocation.

Appellant refers us to *State v. Jones*, 692 S.W.2d 343 (Mo.App.1985) which reversed a trial court that had overruled the challenge to a police officer's wife who thought she knew one of the testifying officers. However, the trial court was reversed, not because it allowed a veniremen who was familiar with a witness to remain, but because that venireman gave confusing and equivocal answers regarding her ability to treat a police officer's testimony on the same basis as that of any other witness. *Id.* at 346–347. In this case, there is no such confusion or equivocation.

Appellant is similarly off the mark citing *Sellers v. U.S.*, 271 F.2d 475 (D.C.Cir.1959). As appellant's own brief points out, *Sellers* deals with a case where the court committed error in refusing to allow the question of whether "any of the jurors [are] inclined to give more weight to the testimony of a police officer *merely because he is a police officer.*" *Id.* at 476 (Emphasis in original). Here defendant was not forbidden to ask this question.

■ It is true that when there is an equivocation the judge has a duty to inquire further. *State v. Ealy*, 624 S.W.2d 490, 493 (Mo.App.1981). Without such independent examination a more searching review by the appellate court is justified. *State v. Holliman*, 529 S.W.2d 932, 939 (Mo.App.1975). Further, errors in the exclusion of veniremen should always be made on the side of caution. *State v. Stewart*, 692 S.W.2d 295, 298 (Mo. banc 1985), *State v. Carter*, 544 S.W.2d 334, 338 (Mo.

App.1976). Finally, the court is mindful of Judge Blackmar's admonition that the juror's assurances are only what might be expected from interrogation by a high authority figure. *State v. Hopkins*, 687 S.W.2d 188, 191 (Mo. banc 1985). (Blackmar J., concurring). Nonetheless, a careful review of the transcript indicates that the trial court did not abuse its discretion in overruling the challenges. While each of the three veniremen was familiar with a witness, each relationship was attenuated. More importantly, the trial court found each capable of fairly and impartially evaluating the officer's testimonies. We cannot conclude that the trial court abused its discretion in overruling the challenges to the three veniremen.

■ The second and third issues raised by appellant contend that the evidence was insufficient to support a guilty verdict and that the evidence seized should be excluded. These contentions require us to review the pertinent facts.

The prosecution's chief witness, Officer Pigg, testified that on May 3, 1984, he drove to the commuter parking lot at Interstate 55 and Richardson Road. After entering the lot, he saw a white male, later identified as Robin Payne, sitting in the driver's seat of a 1981 Pontiac which was parked with its front end against the lot's fence. Payne looked over his left shoulder and saw Officer Pigg. He then left the Pontiac and eased into the passenger side of a 1976 Oldsmobile which had backed in against the fence to the right of the Pontiac. Officer Pigg observed a white male sitting in the driver's seat of the Oldsmobile. Next, both men exited the Oldsmobile, opened and looked under its hood and then closed it and returned to their seats. As the Oldsmobile pulled out of its parking space, Officer Pigg signaled for it to stop.

Officer Pigg approached the Oldsmobile and requested identification. The driver exited his car, leaving his car door open. He identified himself as Robert Barks, the appellant, and told Officer Pigg that he and the passenger were "just getting off" work. By this time, Lieutenant Kemp had

arrived. Officer Pigg walked to the Pontiac and through the driver's window saw a dent puller lying in the front seat. He then arrested Payne and the appellant.

Next Officer Pigg went to appellant's Oldsmobile where the driver's door remained opened. There he saw a white cap, a clothes hanger, a pair of pliers, a socket extension and a pair of vise grips lying on the floorboard on the passenger's side. The clothes hanger had been straightened and a hook fashioned on one side. Officer Pigg returned to the Pontiac and found a can of component cooler. He then went back to the Oldsmobile and seized the evidence he had found. He also found a pair of gloves in the glove box.

Mr. Everett Jenkins, the owner of the Pontiac denied that he had left the items found in his car. He said he had not given Robin Payne permission to enter his car. Detective Michael Wideman of the St. Louis County Police Department Auto Theft Bureau testified that the items found in the Pontiac and Oldsmobile by Officer Pigg were used by auto thieves. Specifically, a thief would spray the cooler into the ignition tumbler system to cause it to become brittle, use the dent puller to pull out the system, and stick the socket extension, the vise grips or the pliers into the steering column and start the engine.

The appellant testified that he and his wife operated auto body shops in St. Charles, Missouri. They had hired Robin Payne via a Government Release Program in order to obtain a tax credit. Both appellant and his wife said that the Halfway House had not told them for what Payne had been imprisoned.

Appellant testified that on May 3, 1984, he and Payne visited several metropolitan area auto dealerships, looking to buy used cars from the "wholesale" lots. While driving in Jefferson County, his car overheated. Eventually he pulled into the commuter parking lot. He released the hood and checked under it; then he noticed that the temperature light had gone out and returned to his seat.

The appellant said that at this time he was unaware that Payne had left his car.

When Payne re-entered the car, they pulled out of the parking space just as Officer Pigg's police car drove up. As he pulled out, the light flashed again and he pulled the hood release. This time, both appellant and Payne left the car to look at the engine. Appellant said that as he was leaving, the police car stopped and the officer tapped his horn, exited his vehicle and asked appellant for identification. The appellant denied telling Officer Pigg that he and Payne had just left work. He denied recalling seeing the coat hanger, and the cap to the component cooler can in his car. He said that it was possible that the other tools found in his car could have been there.

In assessing the claim of sufficiency of the evidence, we accept as true all evidence and reasonable inferences that tend to support the verdict, disregarding all contrary evidence and inferences. *State v. Story*, 646 S.W.2d 68, 72 (Mo. banc 1983). In circumstantial evidence cases, the court must determine whether the circumstances and facts upon which the state relies are consistent with each other, consistent with guilt and inconsistent with any reasonable theory of innocence. *State v. Prier*, 634 S.W.2d 197, 199 (Mo. banc 1982).

Appellant cites several cases where the court found that the evidence did not exclude every reasonable hypothesis of innocence. But, a viewing of the evidence in the light most favorable to the state precludes any such reasonableness theory in this case. Here appellant drove Payne to the commuter parking lot and parked his car next to the car which Payne neither owned nor had permission to enter. When Payne saw Officer Pigg, he exited the Pontiac. And, when he re-entered the Oldsmobile, appellant was sitting in the driver's seat. Tools for stealing vehicles were found in both cars. When asked by Officer Pigg what he was doing, appellant lied, saying that Payne and he were just getting off work.

The evidence above leads to the conclusion that appellant was aware of Payne's absence while he sat in his car, that he

positioned his vehicle so that Payne would have easy access to the targeted vehicle, that when they discovered Officer Pigg they engaged in a brief charade and attempted to flee. When questioned about their presence, they attempted to explain it in terms of being commuters.

Appellant, at trial, testified that he was unfamiliar with the Jefferson County area. Therefore, had he been experiencing car trouble, he would have eagerly informed a law enforcement officer of his plight and sought assistance. Instead, he told Officer Pigg that he was "just getting off." Further, even the claim that he was a car-pooler was not logically sound, for while it gives a facile excuse for Payne exiting the Pontiac and entering the Oldsmobile, usually when people return from the job site, they do not do so in separate cars, with one driver then leaving his car in the parking lot so to join up with another who will take the first driver to his residence.

As appellant correctly states, mere presence at the scene of the crime and opportunity are not enough to support a conviction. *Id.* at 200. But here, in this attempted theft there was more: possession of tools, suspicious behavior, an incriminating admission and flight.

Appellant contends that the court erred in failing to suppress the physical evidence seized. Specifically, he says that there were no grounds for Officer Pigg to make the preliminary stop and that there was no danger of the appellant harming or fleeing from the scene. Further, he states that even if there was reasonable suspicion allowing Officer Pigg to have stopped appellant's vehicle, a search warrant was necessary since the items seized were not "contraband." Finally, he says that certain evidence's prejudicial nature mandated its exclusion. Appellant's contentions are groundless.

The law recognizes that a police officer may, under appropriate circumstances, stop a person to investigate possible criminal behavior even though there is no probable cause to make an arrest. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Ferguson,* 678 S.W.2d 873,

876 (Mo.App.1984) The reasonable suspicion occurs when an officer can point to "specific and articulable facts" which together with rational inferences drawn from the facts, leads him to suspect criminal activity. The facts and inferences need not exclude every possible interpretation save criminal activity. *State v. Purnell,* 621 S.W.2d 277, 285 (Mo.1981).

■ Regarding appellant's contention that there existed no grounds for Officer Pigg to have stopped his Oldsmobile, the facts here demonstrate that reasonable suspicion did exist which permitted him to stop and detain appellant. The suspicious behavior of appellant and his sidekick Payne, namely Payne's rapid departure from the Pontiac after noticing Officer Pigg and the duo's quick inspection of the hood and re-entry of the Oldsmobile are sufficiently suspicious grounds to have allowed Officer Pigg to legally stop defendant's vehicle and request identification.

■ The evidence seized can be logically divided into three groups. First, there is the dent puller and component cooler can found in Everett Jenkin's Pontiac. Appellant lacks standing to challenge the illegality, if any, of Officer Pigg's search there since he did not show a property or possessory interest in the Pontiac. *State v. Scott,* 621 S.W.2d 915, 918–919 (Mo.1981).

■ The second group includes the component cooler lid, the straightened hanger, pliers and socket. "The Fourth Amendment protects only against the violation of one's reasonable expectations of privacy; items left in plain view of government officers negate any inference that one has a reasonable expectation of privacy with respect to those items." *State v. Singleton,* 660 S.W.2d 13, 16 (Mo.App.1983). To qualify the plain view evidence, the court must decide whether the observing officer was in a place with a right to be there, that the discovery was inadvertent and that it was apparent to the police officer that the evidence was incriminating. *Id.* at 16–17. Here, Officer Pigg had legally stopped appellant. Since appellant had left his car

door open, Officer Pigg could easily view the car's floorboard without intruding. Secondly, while Officer Pigg's discovery of this evidence did not come as a total surprise to him, the law does not require such in order for there to be inadvertence. It is enough that the discovery of the evidence was not anticipated and that the police did not know in advance the evidence's location. In other words, an officer's suspicion that evidence may be located somewhere does not preclude inadvertent discovery. *State v. McCurry,* 587 S.W.2d 337, 341 (Mo.App.1979). Finally, pliers, component cooler, vise grips, etc. are apparent to police officers as incriminating evidence of car thieves' implements.

 The final category is the evidence seized from the Oldsmobile which did not fall into plain view. This would include the women's gloves. Appellant's argument is that in order to seize such items, the police must first secure a search warrant unless there was danger of the appellant harming others or fleeing or if possession of the items themselves was a violation of the law. However, "if the vehicle has been lawfully stopped and there is probable cause to believe there is particular contraband or evidence in the car, there is justification to search every part of the vehicle and its contents that may conceal the object of the search." There is no requirement to secure a search warrant. *State v. Ferguson,* 678 S.W.2d 873, 876 (Mo.App. 1984). Here, Officer Pigg had probable cause. Appellant's contention is without merit.

Finally, appellant argues that the admission of the component cooler cap should be overturned as its prejudice to the appellant outweighed its probative effect. Appellant states that the cap "poisoned" the ability of the jury to evaluate the evidence. We have held that it is within the discretion of the trial court to determine whether potentially inflammatory evidence should be admitted. *State v. Kayser,* 671 S.W.2d 352, 355 (Mo. App.1984). Additionally, appellant fails to explain how the trial court abused its discretion or how a coolant cap would be inflammatory. Appellant's point is denied.

The final issue presented is whether the court erred in giving MAI–Cr2d 2.20. Appellant contends that this approved instruction "waters down" the presumption of innocence. His contention is without merit. The use of this instruction by trial courts is mandatory. MAI–Cr2d 2.20 Notes on Use 2; Rule 28.02(a). This court is powerless to declare its use erroneous. *State v. Finch,* 611 S.W.2d 405, 406 (Mo. App.1981).

CRANDALL, P.J., and SATZ, J., concur.