**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Derrick MERRITT,
Defendant-Appellant.**

No. 51389.

Missouri Court of Appeals,
Eastern District,
Division Four.

July 14, 1987.

Motion for Rehearing and/or Transfer
Denied Aug. 13, 1987.

Application to Transfer Denied
Sept. 15, 1987.

Mary Dames Fox, Asst. Public Defender, Clayton, for defendant-appellant.

William L. Webster, Atty. Gen., Colly Frissell-Durley, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SIMON, Judge.

Defendant, Derrick Merritt, appeals his conviction by jury of murder in the first degree in violation of § 565.020 RSMo Cum.Supp.1984 in the Circuit Court of the City of St. Louis. (All further references shall be to RSMo Cum.Supp.1984 unless otherwise noted.) The defendant was sentenced to life imprisonment without eligibility for probation or parole. His twin brother, Darryl Merritt, was also convicted of the same offense in this trial, and his appeal is currently under submission.

On appeal, defendant raises six points contending that the trial court erred in: (1) striking for cause certain venirepersons; (2) refusing defendant's request to strike venireperson Kerlagon; (3) refusing to submit to the jury defendant's Instruction No. "A," MAI–CR 2d 2.41.2, on justifiable use of force in defense of others; (4) denying defendant's objection and motion to strike venireperson Ehrhard; (5) refusing to submit defendant's Instruction No. "B" on the lesser offense of voluntary manslaughter; and (6) overruling defendant's motion in limine and objection to Kermit Johnson's testimony. We affirm.

Defendant was working at an Amoco service station on February 15, 1985 when Ronald Butler, Jr. stopped to purchase gas. Butler, Jr. gave him twenty dollars for gas, but did not receive any change. He later returned to the station, asked for the fifteen dollars change, and defendant refused to pay him any money.

Butler, Jr. went to work at his father's shoe parlor and told his father, Butler, Sr., what had occurred. Butler, Sr. and a friend went to the service station, asked defendant for the change, and an argument ensued. The manager told Butler, Sr. and his friend to leave and return between 6:00 p.m. and 6:30 p.m. that evening when the register closed.

Defendant, his twin brother, Darryl Merritt, and a friend went to Butler, Sr.'s shop approximately one hour later where another heated argument ensued. Defendant and his companions eventually left.

Butler, Sr. returned to the Amoco station sometime between 6:00 p.m. and 6:30 p.m. and was told that no money would be returned to him since the register was short.

Butler, Sr. testified that at approximately 7:30 p.m., defendant and his twin brother returned to the shop, then left. At approximately 8:00 p.m., defendant and his twin brother again returned to the shop, purportedly to give Butler, Jr. his change. While the change was being counted out, defendant and his brother drew guns. When Butler, Jr. reached for defendant's gun, he was shot.

Kermit Johnson testified that he was outside the shoe parlor in his car when a person shot at him. Bullets taken from the car matched those found in the shoe parlor. Darryl Merritt later testified that it was he who shot at Johnson's car, thinking it was Butler, Sr.

Defendant and his brother testified that it was the Butlers who originally pulled guns. According to defendant, Butler, Jr. was shot in defendant's attempt to take Butler, Jr.'s gun away from him. Both defendant and his brother testified that they were afraid of Butler, Sr. who had threatened them, and who had a gun pointed at them.

Defendant and his brother were arrested at their home later that night. The pistol identified as the one that shot Butler, Jr. was found in a tire located in defendant's yard.

Defendant's first point is that the trial court erred in striking for cause venirepersons Nebitt, Riggs, Richerson, McElmorry, Jordan, Sturgeon, and Parks because they stated they had personal opinions in opposition to the death penalty, yet stated that they could deliberate on the guilt or innocence of the defendant. It is alleged that striking these veniremen led to a "death qualified" jury which denied the defendant a "fair and impartial jury drawn from a fair cross-section of the community." In support of his position, defendant cites *Grigsby v. Mabry*, 569 F.Supp. 1273 (E.D. Ark.1983), *aff'd* 758 F.2d 226 (8th Cir.1985), *rev'd sub. nom. Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), illustrating social science studies which demonstrate that a "death qualified" jury produces a venire unrepresentative of a fair cross-section of the community.

Further, defendant argues that § 546.-130 only requires disqualification when a juror's personal objections to the death penalty prohibit him from deliberating on the guilt or innocence of the defendant. Section 546.130 provides:

Persons whose opinions are such as to preclude them from finding any defendant guilty of an offense punishable with death, shall be ineligible to serve as jurors on the trial of an indictment or information charging any such offense, unless such disqualification is waived by the representative of the state when selecting the jury in any such case.

Since these venirepersons stated their ability to fairly deliberate on the question of guilt or innocence, defendant alleges they should not have been stricken, and their elimination as qualified jurors led to a jury heavily biased in favor of conviction.

Where the death penalty is not imposed as here, the trial court did not err in striking venirepersons for cause due to their opposition to the death penalty. *State v. Borden*, 605 S.W.2d 88, 92 (Mo. banc 1980). Furthermore, both the U.S. Supreme Court and our Supreme Court have upheld the constitutionality of "death-qualified" jurors as not depriving a defendant of a fair and representative cross-section of the community. In *State v. Malone*, 694 S.W.2d 723, 727 (Mo. banc 1985), our Supreme Court stated that it "is neither bound by *Grigsby* nor persuaded by it to disregard *Wainwright* and depart from the line of Missouri cases holding that the state may constitutionally exclude jurors who cannot consider death as a possible punishment." *See Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). In view of the foregoing, we find

that defendant's first point is without merit.

Defendant's second point is that the trial court erred in refusing his request to strike venireperson Kerlagon from the panel of prospective jurors because Kerlagon was a former police department employee, the wife of a St. Louis City police officer, and was acquainted with two of the state's police witnesses.

It is a well settled principle that a defendant in a criminal case must be given a full panel of qualified jurors before being required to expend any peremptory challenges. In addition, "denial by a trial court of a legitimate request by an accused to excuse for cause a partial or prejudicial venireperson constitutes reversible error." *State v. Hopkins,* 687 S.W.2d 188, 190 (Mo. banc 1985). However, the record does not indicate any request by defendant to strike Kerlagon for cause.

Our courts have consistently held that an objection or challenge to jurors must be made before the jury is sworn, where the grounds of the objection are known. *State v. Robinson,* 484 S.W.2d 186, 188 (Mo. 1972). *See also, State v. Woods,* 662 S.W.2d 527, 529 (Mo.App.1983) in which our court stated: "A challenge made for the first time after conviction can only be considered for plain error resulting in a miscarriage of justice or manifest injustice."

Under the rationale of *Robinson,* 484 S.W.2d at 188, the grounds for which a challenge for cause could have been made arose during voir dire examination. Kerlagon informed the court that her husband currently is a St. Louis police officer, that she had been employed 7 years ago with St. Louis police department, and that she was acquainted with two of the state's police officer witnesses. Since defendant failed to challenge Kerlagon for cause, our review is for plain error.

Initially, we note that the trial court has broad discretion in determining the qualifications of prospective jurors, and the trial court's ruling will not be disturbed unless it is against the evidence and constitutes a clear abuse of discretion. *State v. Hopkins,* 687 S.W.2d at 189. The trial judge is in a better position to determine a venireperson's qualifications because of his presence and observation, and "any doubts as to the trial court's findings will be resolved in its favor." *State v. Smith,* 655 S.W.2d 745, 747 (Mo.App.1983).

During voir dire, Kerlogan stated that her husband worked for the police department, and that she had previously worked for that same police department. A relationship to a police officer, standing alone, is not a basis for challenging a juror for cause. *State v. Hopkins,* 687 S.W.2d at 190. Here, Kerlagon has more than a relationship. She was once an employee of the same department and acquainted with two police officer witnesses. Kerlagon's relational circumstance simply does not fall within the type of situations mandating the disqualification of a juror. For instance, in *State v. Hopkins,* 687 S.W.2d at 190, the court found that a father's relationship to his police officer son coupled with the fact that the son had died of a violent crime and the fact that he was equivocal on the issue of impartiality served to disqualify him. In *State v. Holliman,* 529 S.W.2d 932 (Mo. App.1975), a juror was held to be unqualified because his son was a police officer on duty at the time an alleged murder occurred, and he was a friend of both the decedent and the decedent's father.

Here, Kerlagon's employment terminated seven years ago, her only tie with the police department is through her husband and her acquaintances. That, by itself, is not enough to disqualify her. In *State v. Land,* 478 S.W.2d 290 (Mo.1972) and *State v. Hunt,* 663 S.W.2d 336 (Mo.App.1983), once one potentially troublesome relationship was discovered, the courts tended to look for evidence of bias and impartiality. An analysis of Kerlagon's answers during voir dire reveals strong unequivocality:

Q.  ... Would you give a police officer more credibility, believe their testimony more simply because they are a police officer?

A.  No.

Q.  Do you think that if you were selected to sit on the jury that you would

have difficulty going home and telling your husband that you returned a verdict of not guilty?

A. No.

Q. Has he inquired of you at all as to what's going on down here, what type of case you're on?

A. Yes, he has, but I've told him very little.

Q. That's fine. Thank you. . . .

Since no bias or impartiality was indicated on her part, and her only tie with the police department is her marriage to a police officer and her acquaintances, the trial court's failure to disqualify Kerlagon did not constitute a miscarriage of justice or manifest injustice. We rule this point against defendant.

Defendant's third point is that the trial court erred in refusing to submit defendant's tendered Instruction No. "A", MAI-CR 2d 2.41.2, on the justifiable use of force in defense of others. Defendant argues that he injected the issue and presented evidence to support the submission of the instruction.

Although neither defendant nor state mentions it in their briefs, an examination of the record reveals that an instruction on the justifiable use of force in defense of third persons was given, Instruction # 9. This instruction is also patterned after MAI–CR2d 2.41.2. Defendant's tendered Instruction No. "A" is identical to the one submitted to the jury, except that defendant's instruction contains an additional paragraph:

If Ronald Butler, Jr., and Ronald Butler, Sr. made threats against Darryl Merritt and the threats were known by or communicated to the defendant, you may consider such threats as explaining the conduct, or apprehensions of the defendant at the time of the encounter, and for the further purpose of explaining the conduct, demeanor and attitude of Ronald Butler, Jr. and Ronald Butler, Sr.

■ We note that, when analyzing whether a proffered jury instruction should have been given, "the evidence must be reviewed in the light most favorable to defendant's hypotheses. . . ." *State v. Ehl-*

*ers,* 685 S.W.2d 942, 948 (Mo.App.1985). If evidence exists establishing a theory of defendant's case, defendant is entitled to an instruction on that theory. *State v. Thomas,* 674 S.W.2d 131 (Mo.App.1984). In homicides, justifiable conduct or self defense, implies that a defendant acted intentionally for his own protection or the protection of others. *State v. Harris,* 717 S.W.2d 233, 236 (Mo.App.1986). Thus, to be entitled to an instruction, defendant must have acted voluntarily and intentionally in defense of his brother. *See State v. Williams,* 545 S.W.2d 342, 344 (Mo.App. 1976).

■ In support of his contention, defendant argues that his testimony met the burden of injecting the issue of justifiable use of force in defense of others. Examination of defendant's testimony indicates that he grabbed the barrel of Ronald Butler, Jr.'s gun and grabbed Ronald's other hand and as the gun turned towards Ronald, it went off and the gun was left in defendant's hand. Defendant testified that he did not have his finger on the trigger, nor did he pull the trigger of Ronald Butler, Jr.'s gun. This evidence does not support defendant's contention that he voluntarily and intentionally shot Ronald Butler, Jr. in defense of Darryl Merritt.

■ Furthermore, an examination of the record and the passages defendant cited to this court fails to reveal any evidence to substantiate that threats were made to Darryl Merritt by both Ronald Butler, Jr. and Ronald Butler, Sr., and that these threats were communicated to defendant. The most we can find resembling threats is testimony by defendant that Ronald Butler, Jr. stated, "I'm going to get my money no matter what," and that defendant fired the gun in the shoe shine parlor because he was scared of Ronald Butler, Sr. This does not constitute evidence of threats made by both Butlers to Darryl Merritt and communicated to defendant. Consequently, defendant was not entitled to receive his version of "defense of others" instruction, i.e., Instruction No. "A." In any event, a "defense of third persons" instruction was giv-

en by the trial court. Thus, defendant was not harmed by the exclusion of his passage relating to threats made by the Butlers.

Defendant's fourth point is that the trial court erred in denying defendant's objection and the motion to strike venireperson Ehrhard. Ehrhard, when initially questioned during voir dire, stated that if the jury found defendant guilty of premeditated murder, the appropriate punishment would be the death penalty rather than life imprisonment. Upon further questioning, Ehrhard indicated that he could consider the alternative punishment of life imprisonment.

> Q. ... Defense counsel asked you at one point if it's proven beyond a reasonable doubt that this is premeditated murder, would you think then the only applicable punishment would be the death sentence. The question was something in that range, and you said, "Yes." Do you understand that the premeditation required for this to be Murder in the First Degree can be for any length of time, no matter how brief. Can you imagine a set of circumstances where it's a premeditated murder and the defendants are found guilty of premeditated murder, Murder in the First Degree, but because of the circumstances, any circumstances you could imagine, you would think that they should be sentenced to life imprisonment instead of death? Could there be any mitigating circumstances about anything that you could imagine that could be presented to you?
>
> A. In certain cases.
>
> Q. That could cause you to say in some circumstances life imprisonment could be more appropriate than death?
>
> A. There could be just a possibility, yes.

Defendant alleges that this predisposition to the death penalty disqualifies Ehrhard as a juror because § 565.030.4(1) requires a juror to find at least one aggravating circumstance before the death penalty may be considered. Therefore, Ehrhard's alleged fixed disposition of automatic imposition would prevent him from following the statutory scheme for murder in the first degree.

■ As stated previously with regard to defendant's second contention, a criminal defendant is entitled to a qualified jury and any refusal of a legitimate request to strike a venireperson for bias constitutes reversible error. *State v. Hopkins*, 687 S.W.2d at 190.

In *State v. Smith*, 649 S.W.2d 417, 422 (Mo. banc 1983), our Supreme Court set forth the standard of review in these circumstances, stating that:

> A clear line cannot be drawn for all cases as to when a challenge for cause should be sustained; there will be instances in which an appellate court might have done differently but cannot say there was an abuse of discretion; each case must be judged on its particular facts; a determination by the trial judge of the qualifications of a prospective juror necessarily involves a judgment based on observation of his demeanor and, considering that observation, an evaluation and interpretation of the answers as they relate to whether the venireman would be fair and impartial as a juror.

In *Smith*, venireperson Kraft originally stated that if defendant were found guilty of capital murder, he would automatically vote for the death penalty. Upon further questioning, Kraft stated that he would, "possibly, yes," consider the sentencing alternative of life imprisonment. When defendant argued that, "possibly, yes," was too equivocal, the court stated that, "it is reasonable to interpret '[p]ossibly, yes' as an abandonment of the equivocal in favor of a positive response...." *Id.* at 424–6.

Similarly, the trial judge, in the instant case, viewing the demeanor of the venireperson and observing the voir dire, interpreted Ehrhard's later responses as indicative of his ability to follow the law. Ehrhard's original statement that he would vote to impose the death penalty if defendant were found guilty of premeditated murder cannot be analyzed by itself. "... the qualifications of a prospective juror are not

determined conclusively by a single response but are made on the basis of the entire examination." *State v. Smith,* 649 S.W.2d at 425, 426.

■ The trial court's judgment will not be reversed except upon a showing of abuse of discretion. *State v. Young,* 701 S.W.2d 429, 432 (Mo. banc 1985). Taking Ehrhard's responses as a whole, we cannot say that the trial court's refusal to strike for cause was an abuse of discretion. In any event, the death penalty was not imposed and defendant was not prejudiced by Ehrhard's inclusion as a juror. In *State v. Thomas,* 625 S.W.2d 115, 127 (Mo.1981), our Supreme Court, reviewing death penalty qualification of a venireperson, stated that defendant did not receive the death penalty and hence cannot raise the objection. Thus, defendant's fourth point is without merit.

■ Defendant's fifth point is that the trial court erred in not submitting defendant's Instruction B on the lesser offense of voluntary manslaughter. The automatic submission of manslaughter mandated by *State v. Stapleton,* 518 S.W.2d 292 (Mo. banc 1975), is no longer required by MAI or the statutes defining the offense. "The rule of *Stapleton* is repealed by legislative action. Section 565.025(3), RSMo Cum. Supp.1983 (effective Oct. 1, 1984)...." *Love v. State,* 670 S.W.2d 499, 502, n. 5 (Mo. banc 1984). Therefore, the resolution of this issue rests on whether defendant has adduced sufficient evidence to support the submission of a voluntary manslaughter instruction. "A defendant is entitled to an instruction on any theory of his case which the evidence tends to establish." *State v. Thomas,* 674 S.W.2d at 137.

■ Section 565.023 provides that voluntary manslaughter is the intentional killing of another person under circumstances that would constitute murder in the second degree except that it occurs under the influence of sudden passion arising from adequate cause. The burden of injecting the issue of "influence of sudden passion arising from adequate cause" is on the defendant. § 565.023.2. Therefore, to be entitled to a voluntary manslaughter instruction, defendant must introduce evidence of sudden passion arising from adequate cause. MAI–CR 2d Supplemental Notes on Use (3), p. 13–9.

■ Assuming arguendo that sufficient evidence did exist justifying the submission of defendant's requested manslaughter instruction, the trial judge's failure to give such an instruction was only harmless error. The jury was instructed on both first degree murder and second degree murder. Since the jury found sufficient evidence to convict for first degree murder, rather than second degree murder, it is unlikely that the jury would have found defendant guilty of voluntary manslaughter. In *State v. Powell,* 728 S.W.2d 622 (Mo.App. 1987), a case very similar to the present one, defendant received first and second degree murder instructions and was ultimately convicted of first degree murder. In response to the argument that a voluntary manslaughter instruction should have been given, our court stated:

> The jury in the instant case found that the evidence supported a finding of deliberation and convicted him of first degree murder; not second degree murder. It is therefore not necessary to decide whether evidence existed to support a manslaughter instruction. The jury convicted appellant of first degree murder and did not take the first step in reducing the offense to second degree murder. Thus, no reasonable basis exists to suggest that the jury would have exercised greater leniency and reduced the conviction to manslaughter.

*Id.* at 625, citing *State v. Smith,* 598 S.W.2d 118, 121 (Mo.1980). We rule this point against defendant.

Defendant's final point is that the trial court erred in overruling defendant's motion in limine and objection to Kermit Johnson's testimony that someone shot at his car. Defendant alleges that such evidence had no probative value to prove any elements of the murder charged and constituted evidence of other crimes.

■ "The general rule is that evidence of other crimes is inadmissible." *State v.*

*Bannister*, 680 S.W.2d 141, 146 (Mo. banc 1984). Exceptions to the general exclusionary rule exist when the evidence of the other crime tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; or (5) the identity of the person charged with the commission of the crime on trial. *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307 (1954).

The standard of review is delineated in *State v. Holliman*, 529 S.W.2d 932 (Mo. App.1975):

> The test is whether evidence of other distinct crimes falls within one of the exceptions is the logical relevancy of the evidence to prove a material fact in issue. If logically relevant, the evidence is not to be rejected merely because it incidentally proves defendant guilty of another crime. On the other hand, if the court does not clearly perceive the nexus ... the accused should be given the benefit of the doubt and the evidence rejected. *State v. Holliman*, 529 S.W.2d at 936.

In the *Holliman* case, while defendant was trying to beat down an apartment door to get to his wife, defendant's niece, living on the next floor, shouted to the defendant. Defendant shot at the niece. Defendant subsequently broke into his wife's apartment and beat her. He later attempted to set fire to the apartment. The court stated that evidence of the prior assault on the wife and the niece helped to establish defendant's intent and motivation concerning the charge of arson.

■ Similarly, in the instant case, Kermit Jackson's testimony that a man shot at him in his car when he was in the immediate vicinity of Butler, Sr.'s shoe shine parlor is logically relevant in establishing defendant's motive and intent regarding the crime charged.

The state's evidence, taken as a whole, reveals that the following scenario occurred surrounding the events to which Kermit Johnson testified. At approximately eight o'clock in the evening or shortly thereafter, Sam Ricks and his girlfriend, Thelores Cobb, drove down Shreve Avenue. They stopped and parked their car, intending to visit a friend who lived above a barbershop located next to the shoe shine parlor. As Cobb was exiting the car, Ricks testified that he heard two loud noises as if someone were beating or trying to break the bricks in the barber shop. He testified that the sound was close. Similarly Cobb testified that she heard a loud sound similar to tin cans hitting together. Cobb went upstairs to visit her friend, and then came back down and sat in the car. Ricks went to the barber shop to check and see if anything had happened there. Ricks peeked in the window first and then looked through the door. Seeing nothing, he moved to come out of the doorway when he saw two men run past him coming from the direction of the shoe parlor. Ricks testified that these men wore dark clothes. Ricks walked towards the shoe shine parlor and saw Ronald Butler, Sr. coming to the door of the parlor saying, "They killed my baby."

Sometime after Cobb had returned to her car and Ricks had gone to check the barber shop, Kermit Johnson drove down Shreve Avenue, passed the shoe shine parlor, saw Cobb, and decided to pull over and talk to her. Johnson testified that he parked his car about three buildings south of the shoe shine parlor, got out of his car, went to Cobb's car, and spoke to her for a couple of minutes. As Johnson was returning to his car, he noticed someone stepping from the side of a church building also located on Shreve. Johnson testified that as he was getting into his car and driving away, two shots hit his car; one in the windshield and one on the right passenger window. Johnson described the assailant as wearing dark clothes. In addition, Cobb stated that the person firing the gun appeared to be a man, and that he was running towards and chasing Johnson's car. Robert Seawood, an employee of a lounge located in the neighborhood, also testified that he saw a man in dark clothes fire at and chase after the car. Ronald Butler, Sr. and other witnesses testified that the defendant and his

brother were wearing dark colored clothing, i.e., black, blue, etc. Bullets taken from Kermit Johnson's car matched those retrieved from the shoe shine parlor. There is no evidence in the record that Johnson had a gun, or that Johnson was shooting at anyone.

The evidence establishes the intent of the Merritts in shooting and killing Ronald Butler, Jr. Furthermore, in the defense's case, Darryl Merritt admitted to the shooting of the car, believing the driver to be Ronald Butler, Sr. Thus, we find this evidence logically relevant, and although it may incidentally prove defendant guilty of another crime, the trial court did not abuse its discretion by admitting it. "The determination whether relevance of the evidence outweighs any prejudice to the defendant lies within the discretion of the trial court." *State v. Bannister*, 680 S.W.2d at 147. We find no abuse of discretion.

Judgment affirmed.

GARY M. GAERTNER, P.J., and STEPHAN, J., concur.