STATE of Missouri, Respondent,

v.

Donald STEWARD, Appellant.

No. 54927.

Missouri Court of Appeals,
Eastern District,
Division Three.

Aug. 15, 1989.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 20, 1989.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

Mary C. McWilliams, Asst. Public Defender, St. Louis, for appellant.

SIMON, Chief Judge.

Defendant, Donald Steward, appeals his conviction by jury of two counts of murder in the first degree in violation of § 565.020.1 RSMo Cum.Supp.1984 and one count of burglary in the first degree in violation of § 569.160 RSMo 1978. We note that the record on appeal intermittently spells defendant's last name as "Stewart," however, both the indictment and the sentence and judgment spell defendant's last name as "Steward." This latter spell-

ing shall be used. Defendant was sentenced to two consecutive terms of life imprisonment without eligibility for probation or parole for the two counts of murder in the first degree and a consecutive sentence of fifteen years imprisonment for burglary in the first degree.

On appeal, defendant contends that: (1) the trial court abused its discretion by overruling defendant's challenge for cause of venireperson 500, Richard Zell; and (2) the trial court erred in overruling defendant's motion for judgment of acquittal at the close of all the evidence and in accepting the jury's verdict in that the evidence was insufficient to sustain his conviction on the two counts of murder in the first degree. We affirm.

Initially, we note that defendant's conviction was reversed and remanded in a prior appeal, and his present appeal concerns his subsequent conviction in another proceeding. *See State v. Steward,* 734 S.W.2d 821 (Mo. banc 1987). In reviewing the record to determine sufficiency of the evidence, "we accept as true all evidence whether circumstantial or direct, tending to prove defendant guilty together with all reasonable inferences supportive of the verdict." *State v. Brooks,* 618 S.W.2d 22, 23[1] (Mo. banc 1981). "Further, we disregard those portions of the record contrary to the verdict, mindful that our function is not to weigh the evidence but to determine 'whether there was sufficient evidence from which reasonable persons could have found defendant guilty as charged.'" *Id.* citations omitted.

The record reveals the following. On October 7, 1984, sixty-seven year old Ruthie Brown (Ruthie) lived with her seventy-three year old sister, Faustina Brown (Faustina), in the upstairs portion of a two-family flat. The sisters lived alone. Just after midnight on October 8, 1984, a neighbor of the Browns, Laverne Laney, heard a banging on her door. Laney testified that the person at the door was defendant, who instructed her to call the police because there was "action going on up at the Browns' house." Laney noted that defendant was holding one of his hands.

Defendant lived near the Browns, knew both sisters, and had performed various errands for them in the past. He had been seen frequently in the company of Michael Sturghill and Herbert Pierce.

When the police arrived at the Browns' residence, they were approached by defendant and Sturghill who stated that the "two ladies had been beaten up upstairs." The Browns' residence exhibited signs of forced entry. A door leading from the basement was splintered and had been forced off its frame. A multi-paned door located at the entrance to the Browns' upstairs living quarters had seven broken panes of glass. Blood was found on the wall behind the glass door, on several glass fragments, on the floor, on a dress found in the rear bedroom of the residence, on pieces of paper, and on a broken window shade stick. The residence appeared ransacked and a telephone had been pulled from the wall. Ruthie was found lying on the floor, and Faustina was found sitting in a chair crying. Faustina appeared shocked, dazed, and confused with bruises on her right arm, elbow, and leg.

Both ladies were taken to Barnes Hospital shortly after 1:00 a.m. on October 8, 1984. Ruthie was pronounced dead. Dr. Mary Case, the pathologist who performed the autopsy on Ruthie, stated that the victim had several broken ribs and a swollen bruise on her right forehead region. The bruise had an abrasion in its center and was a "very fresh" injury. Dr. Case further testified that Ruthie suffered from severe coronary artery disease in which two arteries were completely obstructed prohibiting the flow of blood. As a result of this heart condition, Ruthie could have died at any time. It was Dr. Case's opinion that Ruthie's death was the result of homicide in that the added stress of the situation was too great for her heart to handle. Therefore, her heart failed.

Faustina was diagnosed as suffering from multiple contusions and was released on October 8, 1984. Laney escorted Faustina home. After returning from the hospital, Laney testified that Faustina complained that her head had been hit and that

it hurt in the back area. Laney felt the base of Faustina's scalp and discovered a knot about the size of a quarter. Every time Laney touched the area, Faustina complained of great pain. Faustina also began babbling, which was uncharacteristic of her. She could no longer care for herself. Faustina continued complaining about the pain in the back of her head and returned to the hospital on October 10, 1984. Faustina died on January 11, 1985.

Dr. Case supervised the autopsy of Faustina which revealed evidence of a past blunt trauma to her head. Faustina died from her head injury resulting in a subdural hemorrhage. Dr. Case testified that Faustina's death resulted from homicide due to the head injury which was sustained on October 8, 1984.

At the Browns' residence, the police kept defendant and Sturghill separated. Defendant had gauze bandaging on one of his hands which was bleeding. The gauze also appeared to have blood on it. Defendant told the police that he and Sturghill were on their way home when they noticed that the front door of the Browns' residence was open. Knowing that something was wrong, they went upstairs to see what had happened. The glass door leading to the Browns' upstairs living quarters was locked. Defendant "punched out" one of the glass panes in order to enter the living area where he was confronted by two subjects, one of which displayed a handgun and announced robbery. Defendant was with Sturghill at the time. A fight ensued between defendant, Sturghill, and the two subjects. Defendant, Sturghill, and the Brown sisters were forced into the bathroom. They came out when no noise was heard outside the bathroom for approximately one minute. The Brown sisters then sat in chairs, and defendant and Sturghill went to a pay phone to call the police. Defendant and Sturghill then returned to the Browns' residence to wait for the police. Sturghill's statements to the police were not consistent with those of defendant.

At trial, defendant testified that he encountered Sturghill and Pierce as he was walking to his house, and that they informed him that something had happened at the Browns' residence. Defendant then proceeded to the Browns' residence to see what had happened for himself. He saw Ruthie lying on the floor and Faustina sitting on the floor directly in front of a chair near Ruthie. Upon seeing Ruthie, defendant stated that, "I just got highly upset and I cut and I swung my hand and hit the glass door." He helped Faustina to the chair and then went to the Laney residence asking Laverne Laney to call the police. Defendant also called the police from a pay phone and then returned to the Browns' residence to wait for the police.

Police noticed that the basement door had a shoe print on it indicating that the door had been kicked in by someone wearing tennis shoes. Both defendant and Sturghill were wearing tennis shoes that night. Laboratory tests revealed the presence of blood on both pairs of shoes. Pierce was also wearing tennis shoes when he was apprehended.

Sturghill was taken to the police laboratory to determine if his tennis shoe print matched the pattern of the print on the basement door. As Sturghill removed one of his shoes, he took something from the shoe. He tried to hide the object in his hand and stick it in the pocket of his pants. The object turned out to be United States currency totalling $193.00; i.e., one $100.00 bill, one $50.00 bill, one $20.00 bill, four $5.00 bills, and three $1.00 bills. One of the $5.00 bills had blood on it. Laney testified that it was common knowledge in the neighborhood that the Browns kept large denominations in dress pockets and in handkerchiefs and napkins around the residence.

Police searched Sturghill's garage and found two bags stuffed with envelopes addressed to the Brown sisters. One bag had blood on it. Near the bags was a blood-stained shirt.

Chief Criminalist Harold Messler testified that the shoe print found on the basement door had the same pattern as one of Pierce's tennis shoes. Further, a shoe print found on an envelope on the Browns'

living room floor had the same pattern as one of Sturghill's tennis shoes. Officer Gerald Hart examined two fingerprints taken from a roach powder can found on the floor of the Browns' dining room and determined that they matched those of Pierce.

Criminalist Joseph Crow performed enzyme typing on various blood samples obtained from the Browns' residence and evidence seized during the course of investigating the crime. He testified that the blood found on defendant's tennis shoes matched the blood found on glass fragments from the Browns' multi-paned door, on the wall behind the door, on the dress found in the Browns' bedroom, on pieces of paper found in the Browns' bedroom, on the shirt found in Sturghill's garage, and on the $5.00 bill seized from Sturghill. He further testified that the blood found on defendant's tennis shoes matched the blood found on defendant's gauze bandaging which had been wrapped around defendant's bleeding hand. There was insufficient blood on the broken window shade stick and on Sturghill's tennis shoes from which to determine a match.

At the close of the evidence, the case was submitted to the jury on the theory of accessorial liability. From his conviction of two counts of murder in the first degree and one count of burglary in the first degree, this appeal was taken.

■ In his first point, defendant contends that the trial court abused its discretion by overruling his challenge for cause of venireperson 500, Richard Zell, and forcing him to remove venireperson Zell by peremptory strike in that venireperson Zell could not be fair and impartial given his statement that he currently had a reward offer for the apprehension and conviction of his daughter's rapist and that he had an ongoing relationship with several members of the St. Louis Police Department. Defendant thereby claims he was denied his right to an impartial jury as guaranteed by the Missouri and United States Constitutions.

■ It is well settled that "[a]n accused must be afforded a full panel of qualified jurors before he is required to expend his peremptory challenges; denial by a trial court of a legitimate request by an accused to excuse a partial or prejudiced venireperson constitutes reversible error." *State v. Hopkins*, 687 S.W.2d 188, 190[1,2] (Mo. banc 1985). Further, the trial court has broad discretion in determining the qualifications of prospective jurors. Its ruling will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion. *Id.* at 189. Any doubts as to the trial court's findings shall be resolved in its favor. *State v. Merritt*, 734 S.W.2d 926, 929[1] (Mo.App. 1987) (citation omitted).

■ As our Supreme Court noted in *Hopkins*, a relationship to a police officer alone is not a basis for challenging a juror for cause, nor is a relationship to someone who has experienced a violent crime a sufficient reason by itself to challenge a juror for cause. *Hopkins*, 687 S.W.2d at 190[4] (citations omitted). "It is when these relationships combine with other factors to indicate a lack of impartiality that a challenge for cause must be sustained." *Id.* "[T]he critical test appears to be whether the venireperson makes equivocal or unequivocal statements." *State v. Holt*, 758 S.W.2d 182, 187[10] (Mo.App.1988).

Here, the voir dire of venireperson Zell revealed steadfast impartiality and unequivocality. Venireperson Zell stated that the episode of his daughter's rape would not prejudice him, and that he could set the incident aside and base his verdict on the evidence presented. Further, upon being questioned whether his acquaintance with various police officers would affect his ability to evaluate their testimony, the following occurred:

Q. If a police officer took the witness stand, could you evaluate the testimony the same as you would anybody else?

A. Yes.

Q. Unequivocally?

A. Yes.

Q. Positively?

A. Positively.

In light of venireperson Zell's clear impartiality and unequivocality, the trial court

did not abuse its discretion by refusing defendant's requested challenge for cause. Point denied.

In his second point, defendant contends that the trial court erred in overruling his motion for judgment of acquittal at the close of all the evidence and in accepting the jury's verdict for the two counts of murder in the first degree in that there was insufficient evidence: (1) from which the jury could infer the element of deliberation with respect to defendant's conduct or with respect to the conduct of Pierce or Sturghill; (2) that either Ruthie or Faustina was struck by defendant, Pierce, or Sturghill; and (3) that the deaths of Ruthie and Faustina resulted from the actions of defendant, Pierce, or Sturghill, or that defendant, Pierce, or Sturghill knew that their actions were practically certain to result in the death of either victim.

■ We first consider whether there was sufficient evidence from which the jury could infer the element of deliberation with respect to the conduct of defendant, Pierce, or Sturghill. In so doing, we reiterate that our review is limited to accepting as true all evidence whether circumstantial or direct, tending to prove defendant guilty together with all reasonable inferences supportive of the verdict and disregarding all contrary evidence. *Brooks*, 618 S.W.2d at 23[1]. Our Supreme Court has stated that a "deliberate act is a 'free act of the will' ... done 'in furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose and while not under the influence of a violent passion suddenly aroused by some provocation.'" *Steward*, 734 S.W.2d at 823[3] (citation omitted). The evidence established that defendant ran errands for the Brown sisters, and that it was common knowledge that the Browns kept large demoninations of money in dress pockets and in napkins and handkerchiefs around the residence. The residence was ransacked and exhibited signs of forced entry. Pierce's tennis shoe print matched the pattern of a print found on the basement door. Pierce's fingerprints were found on a roach powder can found in the Browns' residence. Sturg-

hill's tennis shoe print matched the pattern of a print on an envelope found on the Browns' floor. Also, Sturghill had $193.00 in large denomination bills in his shoe. Further, two bags stuffed with envelopes addressed to the Brown sisters were found in Sturghill's garage. Defendant's blood type matched that found on the gauze bandaging, his shoes, the glass fragments broken from the Browns' multi-paned door, the wall behind this door, on one of the Browns' dresses, on pieces of paper found in the Browns' bedroom, on a shirt found in Sturghill's garage near the bags of envelopes, and on a $5.00 bill seized from Sturghill. The foregoing constitutes sufficient evidence from which the jury reasonably could infer the element of deliberation with respect to the conduct of defendant, Pierce, or Sturghill. *See Steward,* 734 S.W.2d at 823[3].

■ We shall next consider whether there was sufficient evidence to support a finding that either Ruthie or Faustina Brown was struck by defendant, Pierce, or Sturghill. The pathologist who performed the autopsy on Ruthie testified that Ruthie had several broken ribs on each side and a swollen bruise on her right forehead region. This bruise was fresh and had an abrasion in its center. Further, hospital records revealed that Faustina suffered from multiple contusions. Laney, a neighbor of Faustina, testified that Faustina complained that her head had been hit and that it caused her great pain. Laney stated that she felt a knot about the size of a quarter on the base of Faustina's scalp. The Deputy Chief Medical Examiner testified that the autopsy revealed a head injury which resulted in her death. From these facts, the jury could have reasonably concluded that defendant, Pierce, or Sturghill struck Ruthie or Faustina. *See Steward,* 734 S.W.2d at 822–23[1, 2].

■ Finally, we shall address the contention that the deaths of Ruthie and Faustina resulted from the actions of defendant, Pierce, or Sturghill, or that defendant, Pierce, or Sturghill knew that their actions were practically certain to result in the death of either victim. Evidence was

presented that both Ruthie and Faustina were elderly women, and that Ruthie did not "get around too well." Their living quarters were ransacked. The pathologist who performed the autopsy on Ruthie opined that Ruthie's death resulted from homicide in that the stress of the situation was too great for her heart to handle. The same pathologist also supervised Faustina's autopsy and testified that Faustina's death was a homicide and resulted from a head injury sustained during an assault. From these facts, the jury could reasonably find that the cause of Ruthie's and Faustina's deaths resulted from the actions of defendant, Pierce, or Sturghill, and that defendant, Pierce, or Sturghill knew that their actions were practically certain to cause the death of either victim. *See Steward*, 734 S.W.2d at 823[2]. Finding defendant's contentions without merit, we rule this point against defendant.

Judgment affirmed.

DOWD, P.J., and HAMILTON, J., concur.