**STATE of Missouri, Respondent,**

v.

**Harold J. MEADOWS, Appellant.**

**Harold J. MEADOWS, Appellant,**

v.

**STATE of Missouri, Respondent.**

Nos. 54220, 56227.

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 23, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 7, 1990.

Application to Transfer Denied
April 17, 1990.

Cheryl Rafert, St. Louis, for appellant.

William L. Webster, Atty. Gen., Robert V. Franson, Asst. Atty. Gen., Jefferson City, for respondent.

HAMILTON, Presiding Judge.

A jury convicted Appellant, Harold Meadows (hereinafter Meadows), of first degree murder, § 565.020 RSMo 1986, on December 10, 1987. The trial court sentenced him to life imprisonment without eligibility for probation or parole. On March 28, 1988, Meadows filed a motion for post-conviction relief pursuant to Rule 29.-15. His counsel filed an amended motion on June 15, 1988. Following an evidentiary hearing, the motion court denied Meadows' request for post-conviction relief. He now appeals both his conviction and the decision of the motion court.

The evidence, when viewed in the light most favorable to the verdict, discloses the following facts. On August 15, 1986, when Meadows and Mark McClure (hereinafter McClure) visited the residence of Jim Drees (hereinafter Drees), McClure attempted to sell drugs to Drees. Meadows and Drees were neighbors. Meadows, Drees, and two of Drees' fellow employees, Patricia Abram (hereinafter Abram) and Bradley Vollmer (hereinafter Vollmer), often met at Drees' house that summer. Abram, Drees, and Vollmer were laid off from their jobs during the summer of 1986. Drees had known McClure for approximately one week before August 15.

Meadows and McClure left Drees' house, only to return later that evening. Drees, Vollmer, and Abram were there when they arrived. They drank beer and played pool. Thereafter, Drees went to bed, and Meadows left. Early on August 16, 1986, McClure, Vollmer, and Abram left Drees' house to buy cocaine. McClure and Vollmer entered the house where they expected to purchase the drugs; Abram remained in the car. McClure and Vollmer, returning to the car without the drugs, told Abram a man took their money so they were going to take his car. They then stole what they believed to be the drug dealer's car and drove it to the Drees residence.

About 3 a.m. on August 16, 1986, Meadows and McClure went together to see McClure's uncle, Gary Kleinigger (hereinafter Kleinigger). Meadows had given McClure's brother, Jeff, money to purchase cocaine for Meadows, and they hoped to find him at Kleinigger's house. After determining Jeff McClure was not at the Kleinigger residence, McClure and Meadows left. Meadows and McClure returned to Drees' house without having obtained any cocaine.

Drees awoke around 10:00 or 11:00 on Saturday, August 16, 1986. Vollmer showed him the stolen car. Meadows, Vollmer, and McClure made telephone calls trying to sell the car. McClure finally found a buyer and all four took the car to sell it. Vollmer signed the title over to the buyer.

During the evening of August 16, 1986, Drees had a barbecue dinner at his house attended by Meadows, Vollmer, and Abram. At one point, McClure was asleep on the living room floor. Abram heard Vollmer and Meadows talking about the stolen car. Drees was also present. Vollmer said he was not going to jail over a stolen car and that "we have to get rid of him." Vollmer, who was on probation, feared it would be revoked if McClure said anything about the stolen car.

Drees and Abram went into the house, but Vollmer followed and asked Drees for a knife. Drees gave Vollmer a knife. Meadows and Vollmer said they were going to stab McClure, kill him, and throw him in

the river. Drees, Abram, and their children left Drees' house for forty-five minutes to an hour.

While Drees and Abram were gone, Kathy Kalish (hereinafter Kalish) arrived at the Drees residence. Meadows, answering the door, appeared nervous. He refused to allow Kalish to enter the house or to wait for Drees. Instead, he loaned her $20 and sent her to a bar.

When Drees and Abram returned, Meadows, Vollmer, and McClure were no longer in the house. The children discovered blood in the basement. Drees and Abram cleaned up the blood from the floor. They also observed a hole in the wall having a diameter of three feet, a knife, a bucket of bloody water, and Vollmer's belt in the basement.

Meadows called Drees approximately one week later and asked him to come to his house to discuss something important. He told Drees that the discovery of McClure's body had been reported on the news. When Drees questioned him, Meadows explained that the damage to Drees' basement occurred while they were fighting with McClure, trying to kill him. He said that he and Vollmer transported McClure's body in Vollmer's truck to Chain of Rocks on the Missouri River, weighted the body with rocks, and dragged it out into the river.

Meadows told a similar story to Michael Morgan (hereinafter Morgan) during a party at the house of John Suggs (hereinafter Suggs) near the end of August. Meadows assured Morgan that he would not have to worry about McClure any more, referring to him as a "little rip-off son-of-a bitch." Meadows said that he had choked McClure.

McClure's body was found August 19, 1986, near the Chain of Rocks Canal in Illinois. The medical examiner for Madison County, Illinois, testified the body had been submerged in the water within a one week period. Although the body exhibited cutting wounds, the cause of death was strangulation before immersion in water.

Because Meadows was one of the last people to see the victim alive, the Madison County Sheriff's Department interviewed

him on September 2, 1986. Meadows said that he did drugs with both McClure and his brother, Jeff, and that he last saw Mark McClure at a 7–Eleven convenience store. During a second interview on September 4, 1986, Meadows said he was with McClure at Drees' house on August 13, that he saw McClure at the 7–Eleven, but that he had stayed home on August 16.

Meadows contacted an officer with the Overland Police Department who was assigned to the Municipal Enforcement Group as an undercover drug officer. Meadows told the undercover officer that he knew McClure and that McClure was a thief. He said that McClure stole a car with someone in Kinloch who was on probation and who killed McClure. He again said he last saw McClure at the 7–Eleven convenience store. An officer was thereafter assigned to survey Meadows' house. On the afternoon of February 9, 1987, police arrested Meadows after he observed the police car outside his house, sped past it in his car and was stopped.

Meadows was advised of his rights both when he was told he was a suspect in a homicide investigation and again when the officer served a warrant for murder in the first degree. Meadows executed a Miranda waiver and denied killing McClure. He failed to respond when asked whether he knew who had killed McClure. When asked if he had been present, he responded, "I won't lie to you."

Meadows testified in his own behalf at trial. He admitted that he helped Vollmer dispose of McClure's body but stated that Vollmer actually killed McClure. He said that he was upstairs in the bathroom and went to the basement only after he heard a noise like a fight. He then saw Vollmer choking McClure with a cord and the knife. Meadows further testified he drove the truck and helped dispose of the body only because he feared Vollmer. Ultimately, the jury found Meadows guilty of murder in the first degree.

Meadows raises eight points on direct appeal. He asserts the trial court erred because it (1) admitted evidence of un-

related crimes; (2) sustained the State's motion to strike venirepersons who opposed the death penalty; (3) denied him counsel at arraignment; (4) refused to submit instructions regarding witness immunity and voluntary manslaughter; (5) overruled defense objections to hearsay testimony and to questions asked on redirect examination; (6) sustained the State's objection to defense attorney's questioning of Donald Spaul and Kathy Kalish and refused to admit Exhibit A; (7) denied him an opportunity to appear and testify before the grand jury; and (8) denied his motion for judgment of acquittal even though the evidence was insufficient, as a matter of law, to support a finding of guilt.

Meadows has failed to preserve Points I, III, and VII for appellate review because he raised none of them at the trial level. *See St. Louis County v. McClune*, 762 S.W.2d 91, 92–93 (Mo.App.1988). Moreover, even had he preserved these points, each lacks merit.

■ In Point I, Meadows asserts that evidence of other crimes, that is, the sale or use of narcotics and the stealing of an automobile, was improperly admitted at trial. Evidence concerning drug usage and attempts to find a buyer for the stolen car were, however, intimately connected to the crime with which Meadows was charged. *State v. Trimble*, 638 S.W.2d 726, 732 (Mo. banc 1982); *State v. Buckles*, 636 S.W.2d 914, 918 (Mo. banc 1982); *State v. Clark*, 711 S.W.2d 928, 934 (Mo.App.1986). Such evidence is admissible when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing more than one crime so related that proof of one tends to establish the other; or (5) the identity of the person charged. *Trimble*, 638 S.W.2d at 732; *State v. Merritt*, 734 S.W.2d 926, 933 (Mo.App.1987). In addition, evidence of other crimes is admissible when criminal conduct is part of a continuous occurrence intimately connected with the crime for which the defendant is on trial. *State v. Kenley*, 701 S.W.2d 185, 186 (Mo.App. 1985). Thus, the state may "paint a complete and coherent picture of the crime charged and it is not required to sift and separate the evidence and exclude the testimony tending to prove the crime for which defendant is not on trial." *Id.* (quoting *State v. King*, 588 S.W.2d 147, 150 (Mo. App.1979)). Here the evidence of drug usage was admissible to present a complete and coherent picture of events surrounding and contributing to commission of the McClure murder. Similarly, the evidence regarding the stolen car was admissible to show a complete and coherent picture of the murder as well as to demonstrate Meadows' motive and intent to kill McClure.

■ Meadows asserts in Point III that he was denied counsel at arraignment. This point, however, is unsupported by the record. It shows that a public defender filed his entry of appearance on the date of Meadows' arraignment.

■ Point VII, in which Meadows asserts prejudicial error because the trial court denied him the right to appear and testify before the grand jury, is unsupported by Missouri case law. An accused has no absolute right to appear before the grand jury. *State v. Greer*, 605 S.W.2d 93, 96 (Mo.1980), *vacated on other grounds*, 451 U.S. 1013, 101 S.Ct. 3000, 69 L.Ed.2d 385 (1981).

■ Meadows has also failed to preserve Points IV, V, VI, and VIII. In Point IV, Meadows asserts error in the trial court's refusal to submit instructions regarding witness immunity (instruction A) and voluntary manslaughter (instruction B). He has failed, however, to set forth in full these proffered instructions in the argument portion of his brief as required by Rule 30.06(e). *State v. Harris*, 717 S.W.2d 233, 235 (Mo.App.1986). Nor has Appellant included these instructions in the legal file. Thus, we can only speculate as to their content. If, as Meadows contends, instruction A concerned witness immunity, it was properly refused because no general statutory authority exists in Missouri permitting the State to compel testimony through a grant of immunity from prosecution. *State ex rel. Munn v. McKelvey*, 733 S.W.2d 765, 768 (Mo. banc 1987). More-

over, to the extent this refused instruction referred either to a promise by the prosecutor not to prosecute a person in exchange for his testimony or to reduce charges in exchange for trial testimony, it was unnecessary. The State's agreements made with witnesses Drees and Morgan were fully disclosed during their respective testimony. Furthermore, refused instruction B, allegedly concerning voluntary manslaughter, was unwarranted by the evidence because the record discloses no evidence of sudden passion. *Merritt,* 734 S.W.2d at 932. *See* MAI–CR 3d 313.00, Supplemental Notes on Use 2, Note 4(A)(3).

■ Meadows has failed to cite authority for Points V and VI and has presented little argument, thus violating Rule 30.-06(d). Absent proper explanations as to why no authority is cited, points relied on without citation are deemed waived or abandoned. *State v. King,* 747 S.W.2d 264, 279 (Mo.App.1988).

■ Even when considered under a standard of plain error, these claims must fail. Point V alleged error in overruling Appellant's objections to that portion of Drees' testimony containing alleged hearsay statements made by Vollmer to Meadows and to questions asked Drees on redirect examination. The alleged hearsay concerned Vollmer and Meadows' conversation about "getting rid" of McClure because Vollmer refused to go to jail over a stolen car. These statements by Vollmer were not hearsay because they were not offered to prove the truth of the matters asserted but rather to show the statements were made and that Vollmer planned to kill McClure. *See State v. Harris,* 620 S.W.2d 349, 355 (Mo. banc 1981). The claim of error with respect to defense objections to the State's redirect examination of Drees is without merit. Meadows fails to state why the trial court's rulings, which concerned the admission or exclusion of evidence, were erroneous. A trial court has great latitude in ruling on whether to admit or exclude evidence. *Clark,* 711 S.W.2d at 932. Absent a showing of clear abuse, we refuse to interfere with evidentiary rulings.

*Id.* A review of the record fails to demonstrate such clear abuse.

■ In Point VI, Meadows contends the trial court erred in sustaining the State's objection to the cross-examination of Donald Spaul (hereinafter Spaul), a detective sergeant, and Kathy Kalish and in refusing to admit Exhibit A, an affidavit by Detective Barrale requesting a search warrant for Drees' residence. The affidavit was based upon information that Spaul obtained from Drees and that Spaul then communicated to Barrale. The trial court correctly excluded the affidavit as hearsay and properly refused to allow cross-examination of Spaul as to the affidavit, a collateral matter. Because both the record and the claim of error are unclear with respect to the Kalish cross-examination, we find nothing preserved for review.

■ Point VIII alleges that overruling the motion for acquittal was error "because the evidence·was insufficient, as a matter of law, to support a finding of guilt beyond a reasonable doubt." This point is insufficient to preserve anything for review. *State v. Mayo,* 593 S.W.2d 644, 645–46 (Mo.App.1980). The evidence of record is sufficient to show that Meadows discussed killing McClure with Vollmer and that he and Vollmer remained in the house with McClure after asking for a weapon. By his own admission, Meadows participated in disposing of the body.

■ In Point II Meadows asserts the trial court committed prejudicial error in sustaining the State's motion to strike venirepersons who stated they opposed the death penalty and in denying Meadows an opportunity to rehabilitate those venirepersons. He contends the State's strikes resulted in a death-qualified and conviction-prone jury. This claim has previously been raised and rejected in this state where, as in this case, the death penalty is not imposed. *State v. Borden,* 605 S.W.2d 88, 92 (Mo. banc 1980); *State v. Merritt,* 734 S.W.2d 926, 928 (Mo.App.1987). Both the United States Supreme Court and the Missouri Supreme Court have upheld the constitutionality of excluding jurors who cannot consider death as a possible punish-

ment. *Lockhart v. McCree,* 476 U.S. 162, 165, 106 S.Ct. 1758, 1760, 90 L.Ed.2d 137 (1986); *State v. Guinan,* 732 S.W.2d 174, 176 (Mo. banc 1987), *cert. denied,* 484 U.S. 933, 108 S.Ct. 308, 98 L.Ed.2d 266 (1987). The trial court, therefore, abused no discretion in striking venirepersons who opposed the death penalty. Point II is denied.

Point IX asserts error by the motion court in denying Meadows' Rule 29.15 motion after an evidentiary hearing because trial counsel was ineffective in (1) failing to object to evidence of other crimes; (2) failing to present alibi witnesses; (3) failing to object to prosecutor's improper statement of law regarding the death penalty; (4) failing to rehabilitate the venirepersons; (5) failing to present evidence of Meadows' good character; (6) failing to move for a psychological evaluation of witness Drees; (6) failing to object regarding the immunity awarded state witnesses; (8) failing to move to suppress Meadows' statements; (9) failing to object to leading questions; and (10) identifying himself as the prosecutor to a witness.

Review of the denial of a Rule 29.15 motion is limited to a determination of whether the findings and conclusions of the motion court are clearly erroneous. Rule 29.15(j); *Moton v. State,* 772 S.W.2d 689, 691 (Mo.App.1989). The findings, conclusions, and order of the motion court are clearly erroneous only if a review of the entire record leaves the appellate court with a definite and firm impression that a mistake has been made. *Id.* This Court must defer to the motion court's determination of credibility. *Brummell v. State,* 770 S.W.2d 379, 381 (Mo.App.1989).

▇▇▇ To prevail on an ineffective assistance of counsel claim, a movant must show both that trial counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984); *Hamm v. State,* 768 S.W.2d 574, 576 (Mo.App.1989). Counsel's performance is deficient if it was unreasonable considering all the circumstances. *Richardson v. State,* 719 S.W.2d 912, 915 (Mo.App.1986). Coun-

sel is presumed competent. *Id.* Deficient performance is prejudicial if a reasonable probability exists that, but for the deficiencies, the result of the proceeding would be different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

▇▇▇ Five of Meadows' ten claims of ineffective assistance of counsel concern a failure to object to the introduction of evidence or a failure to move to suppress his statements. A mere failure to object alone will not sustain a finding of ineffective assistance of counsel. *Nunn v. State,* 755 S.W.2d 269, 272 (Mo.App.1988). A genuine deprivation of the right to a fair trial must result from the failure. *Id.* Clearly, trial counsel is not ineffective for failure to make a nonmeritorious objection. *Shaw v. State,* 686 S.W.2d 513, 516 (Mo.App.1985).

▇▇▇ Meadows asserts that he was prejudiced by his counsel's failure to object to evidence of other crimes. While evidence of unrelated crimes is clearly inadmissible, in this case, the drug use and stolen automobile were integrally related to the crime for which Meadows was charged. *See State v. Trimble,* 638 S.W.2d 726, 732 (Mo. banc 1982); *State v. Clark,* 711 S.W.2d 928, 934 (Mo.App.1986). Thus, any objection would have been nonmeritorious. Furthermore, the motion court found that trial counsel made a decision of trial strategy with respect to evidence of drug usage. At the motion hearing, trial counsel stated the entire issue of drug usage was so intertwined that he could not separate movant's drug usage from that of other participants. The choice of defense tactics ordinarily will not support a claim of ineffective assistance of counsel. *Young v. State,* 761 S.W.2d 725, 728 (Mo.App.1988).

▇▇▇ Meadows contends his attorney's failure to object to a misstatement of law concerning the death penalty during voir dire resulted in prejudice. The prosecutor stated to the venire that, "if the Court said certain criteria exist you must give the death penalty." While the statement does misstate the law under § 565.032 RSMo 1986, Appellant suffered no prejudice by it. The trial court correctly instructed the

jury, and Meadows received a life sentence, not the death penalty.

Trial counsel made no objection to the testimony of two State's witnesses, one of whom avoided prosecution and the other received a more favorable sentence in exchange for their trial testimony. Both witnesses, however, testified to the agreements they had with the State. Any objection would have been nonmeritorious.

As to counsel's failure to object to leading questions, the motion court correctly found that Movant failed to specify which questions were objectionable and failed to demonstrate prejudice resulting therefrom.

Finally, Meadows asserts he was prejudiced by his counsel's failure to object to or move to suppress his own statements made to police officers. The motion court made a specific finding that "all the statements were exculpatory in nature and all statements were properly admissible." No prejudice therefore resulted to Movant.

Meadows also contends his trial attorney was ineffective in failing to call alibi witnesses and other witnesses that supported his case. Ordinarily, the choice of witnesses is a matter of trial strategy and will support no claim of ineffective assistance of counsel. *Young*, 761 S.W.2d at 728. The Movant has the burden during a post-conviction relief proceeding to prove (1) that the witnesses could be located through reasonable effort; (2) that the witnesses, if called, would have testified; and (3) that the testimony would have provided a viable defense. *Id.* Movant's own evidence indicates that John Suggs was unavailable and the content of his testimony was unknown. The record shows that Brad Vollmer, according to his attorney, would not have testified on behalf of Movant. Finally, Movant failed to show that Officer Barrale, his parents, his ex-wife or Officer Unger's testimony would have provided a viable defense.

Meadows next contends that failure to rehabilitate jurors on the question of whether they could impose the death penalty was prejudicial. Because, however, the sentence was life imprisonment, not death, Movant cannot show the necessary prejudice.

Movant contended to the motion court that the failure of trial counsel to introduce evidence that he had no prior convictions constituted ineffective assistance of counsel. The scope of our review is limited to what was raised in the motion court. The motion court specifically found that Movant failed to show that this prejudiced him. Furthermore, the record contains ample evidence that this omission was a matter of trial strategy to prevent opening the door to evidence of prior bad acts.

Meadows further contends that trial counsel should have moved for a psychiatric evaluation of one of the State's chief witnesses. Because no authority exists for ordering such an examination, any such motion would have been meritless. *See State v. Sinner*, 772 S.W.2d 719, 721 (Mo. App.1989).

Finally, Movant contends trial counsel was ineffective for representing himself as the prosecutor to a witness. The motion court specifically found no evidence to show that his attorney identified himself as the prosecuting attorney. Movant refers to the testimony of Kathy Kalish in which she stated trial counsel identified himself as the prosecutor to Mike Dunn. Trial counsel, however, testified before the motion court that he told Dunn he was investigating the *Meadows* case and that he correctly identified himself to Dunn. The motion court found trial counsel's account more credible.

Movant has thus failed to demonstrate that the findings and conclusions of the motion court were clearly erroneous. Point IX is denied.

Affirmed.

CARL R. GAERTNER and STEPHAN, JJ., concur.